THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUDITH ANN BENKOWSKI, Defendant-Appellant.

Second District   No. 2—89—1278

Opinion filed July 12, 1991.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Defendant, Judith Ann Benkowski, entered a nonnegotiated plea of guilty to three counts of murder, conspiracy to commit murder, and solicitation of murder for hire. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), 8—2(a), 8—1.2(a).) Although finding defendant eligible for imposition of the death penalty because she had "procured another to commit the murder for money or anything of value" (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(5)), the court nevertheless found two statutory factors in mitigation (see Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c) *et seq.*). Thus, the defendant's lack of a criminal history and absence from the scene at the time of the commission of the murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(c)(1), (c)(5)) precluded imposition of the death penalty. After a sentencing hearing, the court found that the victim's age of 67 years at the time of his murder and the brutal and heinous nature of the offense justified an extended sentence of 100

years' imprisonment. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b).) Defendant appeals asserting that: (1) the trial court abused its discretion in imposing the maximum extended sentence; and (2) the court erroneously entered defendant's convictions and sentences on the inchoate offenses of conspiracy to commit murder and solicitation of murder for hire. We affirm in part and reverse in part.

Defendant entered a guilty plea to charges stemming from the November 4, 1988, contract murder of her 67-year-old husband, Clarence Benkowski. Defendant paid Edward Brown, who entered a negotiated guilty plea in exchange for a natural-life sentence, to kill her husband. Debra Santana, who was a common friend of both defendant and Brown and who was instrumental in the murder, also entered a negotiated guilty plea in exchange for a 22-year sentence of imprisonment.

Because defendant appeals only her sentence, we can dispense with a detailed recitation of the facts. In the early fall of 1988, defendant secured the services of Brown to accomplish the murder of her husband. The killing was initially planned for October 3, 1988, but was cancelled. Defendant continued to meet and plan the killing with Brown during the month of October and, eventually, on November 4, 1988, defendant drugged her husband with sleeping pills to insure his sound sleep, locked the family dog in a spare room, and provided Brown with access to her home, her husband's gun, a pillow to muffle the sound of the gunshots, and directed Brown to the bedroom where her husband lay taking his customary morning nap. Brown received $3,000 and defendant's wedding rings worth $4,000 for the killing. Defendant ransacked the bedroom to make it appear as if a home intruder had committed the murder and then left with Santana for drinks and lunch. Returning several hours later, they then notified police. Although originally telling police the arranged home intruder version of events, defendant eventually confessed and identified both Brown and Santana as participants. Defendant entered a nonnegotiated plea of guilty, and a death penalty hearing took place. The court found defendant eligible for the death penalty but specifically found that her lack of a criminal record and her absence from the bedroom where her husband lay sleeping when Brown shot him were sufficient factors in mitigation to prevent imposition of the death penalty.

The hearing continued with the sentencing phase at which the State sought a sentence of natural life, and defendant's counsel suggested the minimum sentence of 20 years' imprisonment. The court accepted additional evidence in aggravation and mitigation, including

defendant's version of the events leading to her husband's death. However, defendant's version of events differed in several critical respects from that of Brown.

Brown testified that defendant approached him and that he had resisted the idea of killing her husband. However, defendant persisted, and Brown eventually agreed to kill defendant's husband for $2,000, despite his reservations. Prior to the original planned murder date of October 3, 1988, when Brown learned that defendant had told Santana and defendant's boyfriend of the plan, Brown withdrew from the plan because too many people knew. Defendant again urged Brown to proceed and gave him an additional $1,000 and her wedding rings and promised him another $1,000 after the killing occurred. Again on November 4, 1988, after Brown arrived in the morning to fulfill the plan only to find no one home, he attempted to withdraw from the plan. However, defendant once again prevailed upon Brown to proceed. Brown testified that at no time did defendant express any reservations or attempt to stop the killing of her husband and that she appeared happy and rubbed her hands together, as if in glee, after Brown shot defendant's husband with her husband's own gun as her husband lay sleeping in his own bed. Defendant suggested the story of a home invasion and gave Brown her VCR to cover up the murder before leaving with Santana for lunch and drinks to establish her alibi.

In contrast, defendant testified that Santana suggested that Brown, who was Santana's boyfriend, get rid of defendant's husband for defendant permanently. Brown never balked at the idea, and it was defendant who continually expressed reservations and attempted to withdraw from the plan only to have Brown insist that it proceed. Defendant testified that she actually physically tried to stop Brown as he approached the room where defendant's husband lay sleeping, only to be struck and pushed aside by Brown and held by Santana until the killing was over. Brown took defendant's wedding rings from the dresser in the bedroom where the murder occurred and the VCR from the living room and told her to ransack the house to make it look like a home invasion. After Brown left, Santana suggested the alibi of lunch and shopping, which defendant agreed to in a daze, and defendant could not eat once she and Santana arrived at the restaurant.

An inmate of the Du Page County jail, who had been assigned to a cell with both Santana and defendant at different times and who was herself awaiting sentencing on charges stemming from the murder of her husband, testified that both Santana and defendant had told her that defendant tried to stop Brown, who pushed defendant

away, and was further restrained from so doing by Santana. Other witnesses including a Du Page County Department of Corrections matron, defendant's sister, neighbor, and minister, each testified to defendant's sweet and caring, honest, maternal and deeply religious nature. Defendant completed her GED high school degree as well as other classes, including Bible studies, while incarcerated awaiting trial. Defendant expressed remorse for her actions and regret for the suffering she had caused her family, including the sons she shared with her husband, as well as her husband's family.

However, the court explicitly rejected the defendant's testimony, including her statements of remorse, as without credibility and a complete contradiction of common sense. It found that the testimony of the Du Page County Department of Corrections inmate was totally incredible and did not consider it whatsoever. It further found that other testimony in mitigation that defendant was sweet and caring, honest, deeply religious, and a concerned mother was contradicted by the degree of her participation in the events leading to her husband's death. Rather, the court found that the defendant's conduct in planning and persistently pursuing her husband's murder over the course of several months without any attempt to stop it, participation in the murder by supplying the murder weapon, drugging her husband, locking up the family dog, providing access to her home, paying for her husband's death with her wedding rings and Christmas money, and attempting to cover up the murder were premeditated and cold-blooded and, thus, brutal and heinous and indicative of wanton cruelty.

The court found that the statutory factor of exceptionally brutal and heinous conduct indicating wanton cruelty, as well as the victim's age over 60 years, warranted an extended sentence. The court noted that a natural-life sentence, as requested by the State, was similar to an extended sentence. Either sentence could be imposed based upon a finding of exceptionally brutal and heinous conduct, and a natural-life sentence could also be imposed if any of the factors required for the death penalty were present, which the court had already found existed beyond a reasonable doubt, although mitigation prevented such penalty. Thus, the court found defendant eligible for either a natural-life sentence or an extended sentence and, after considering the factors in mitigation and aggravation, sentenced defendant to 100 years' imprisonment for first degree murder, 40 years' imprisonment for solicitation to commit murder, and seven years' imprisonment for conspiracy to commit murder, with the sentences to run concurrently.

Defendant appeals, asserting that the court erred in sentencing her for the inchoate offenses of solicitation and conspiracy. Defendant

also asserts that the court abused its discretion in sentencing her to an extended term of 100 years' imprisonment. She asserts that the statutory provision allowing an extended sentence for offenses against victims over the age of 60 years was not applicable because her husband's age was not the motivation in her choice of him as a victim and that her conduct was not brutal or heinous.

We agree, as does the State, that defendant's sentences for solicitation of murder and conspiracy to commit murder were incorrectly entered. (Ill. Rev. Stat. 1987, ch. 38, par. 8—5.) Therefore, defendant's convictions of those offenses are reversed and those sentences vacated. However, we do not find equal merit in any of defendant's assertions regarding her sentence for first degree murder.

The proper setting for the formulation of a defendant's sentence is in the trial court, which has considerable discretion to determine the sentence that is suitable to a defendant's offense. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492.) Thus, a trial judge's sentencing decision is entitled to great weight and deference. (*La Pointe*, 88 Ill. 2d at 492-93, citing *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) When the sentence imposed is within the limits established by the legislature for the offense, we will not modify it merely because we might have balanced the aggravating and mitigation factors differently. (*People v. Jorgensen* (1989), 182 Ill. App. 3d 335, 343.) Further, just as with the sentencing decision, the determination of what conduct constitutes brutal and heinous behavior is committed to the discretion of the trial court, and so long as the court does not consider incompetent or unreliable evidence, improper aggravating factors, or ignore pertinent mitigating factors, the court has wide latitude in sentencing a defendant to any term within the statutorily prescribed limits. (*People v. Brown* (1990), 195 Ill. App. 3d 78, 86-87.) Only if the judgment of the trial court is palpably erroneous or manifestly unjust will an abuse of discretion in sentencing be found. (*Brown*, 195 Ill. App. 3d at 87.) The infliction of torture or unnecessary pain is not required to find that a crime was brutal or heinous, the second statutory factor that allows the imposition of an extended sentence. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501.) Rather, "brutal" has been defined as "grossly ruthless," "devoid of mercy or compassion [and] cruel and cold-blooded." (*La Pointe*, 88 Ill. 2d at 501.) So, too, "heinous" has been defined as "hatefully or shockingly evil[,] grossly bad[,] or enormously and flagrantly criminal." (*La Pointe*, 88 Ill. 2d at 501.) Thus, premeditation and cold-bloodedness are sufficient in certain situations to justify an extended sentence. (*La Pointe*, 88 Ill. 2d at 501; see *People v. Bedony* (1988), 173 Ill. App. 3d 613 (extended-

term sentencing decided on case-by-case basis).) A trial court need find only a single statutory factor in aggravation to impose an extended sentence. Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b); *People v. Jackson* (1986), 140 Ill. App. 3d 318, 325.

■ Defendant contends that the deterrence of crimes against the elderly, who are easily victimized because of their age, is the purpose of an extended sentence for felonies committed against those over 60 years of age. Defendant argues that the victim was not the target of her offense because of his age, but rather because of his relationship to her as her husband. Thus, she asserts that the age of the victim was unrelated to her crime and an extended sentence was inappropriate in this instance. We decline to read the extended-sentence provision so narrowly.

A similar argument to that raised here by defendant was considered and rejected by the Appellate Court for the Fourth District in *People v. Huber* (1986), 144 Ill. App. 3d 195, 197-98. In *Huber*, the defendant was convicted of reckless homicide and sentenced to an extended term based on the decedent's age of five years old. The defendant argued that a reckless homicide, because it was not intentional, could not be deterred by an extended sentence based on the age of the victim. Thus, a sentence to an extended term of imprisonment failed to serve the purpose of the statute. The court rejected that argument. Instead, it relied on the determination of the legislature that crimes against the young were "a greater harm to society than those committed against persons" who were older. It found that, although the age of the victim had no part in the defendant's decision to undertake his criminal conduct, the presence of that single factor was sufficient to impose an extended sentence. *Huber*, 144 Ill. App. 3d at 198.

Similarly, we find that the legislative determination that crimes against the elderly are a greater harm to society renders the age of the victim of 67 years sufficient to impose an extended sentence on defendant without regard to the effect, or lack of effect, that the victim's age may have had on defendant's decision to commit the offense of which she was convicted.

■ Having determined that the court's decision to impose an extended sentence was supported by the presence of at least one statutory factor, we need not address defendant's claim that her conduct in arranging the contract killing of her husband was not brutal or heinous. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b); see *Jackson*, 140 Ill. App. 3d at 325.) However, in this instance we note that the court not only explicitly rejected defendant's evidence in mitigation,

including her own testimony and statements of remorse, as incredible, but detailed its findings in aggravation by listing each instance of premeditated and cold-blooded conduct undertaken by defendant in the course of planning and executing the plan to murder her husband. The trial court need not have accepted defendant's exculpatory version of events if it found such story to be improbable. (See *People v. Freeman* (1988), 167 Ill. App. 3d 740, 744.) Such determination of the credibility of the witnesses and weight to be given their testimony was well within the power of the court as trier of fact (see *People v. Ellis* (1978), 74 Ill. 2d 489, 496) and is entitled to great weight. (*Freeman*, 167 Ill. App. 3d at 744.) Thus, we cannot say that the court abused its discretion in finding that defendant's conduct in procuring the contract murder of her husband, which defendant engineered and in which she participated, was brutal and heinous indicating wanton cruelty.

Defendant's sentence of 100 years' imprisonment on her conviction of murder is affirmed. The convictions of conspiracy to commit murder and solicitation of murder are reversed, and those sentences are vacated.

Affirmed in part; reversed and sentences vacated in part.

GEIGER and McLAREN, JJ., concur.