THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK McGHEE, Defendant-Appellant.

Second District   No. 2—91—0521

Opinion filed December 15, 1992.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Sherry R. Silvern, of Aurora, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Frank McGhee, was indicted in the circuit court of Kane County on one count of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)), one count of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2) and one count of attempted murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1). Following a jury trial, defendant was found guilty of all three offenses and sentenced to concurrent 35-year extended terms of imprisonment on the armed robbery and attempted murder convictions.

Defendant raises the following issues on appeal: (1) whether he was denied a fair and impartial jury; (2) whether he was denied a fair trial by the combination of police officer testimony regarding defendant's fingerprint cards and another witness' testimony that defendant

told him that defendant committed robberies for a living; (3) whether defendant was denied the effective assistance of counsel based on his trial counsel's refusal to allow him to testify; (4) whether defendant was proved guilty beyond a reasonable doubt; and (5) whether the trial court abused its discretion in sentencing him to concurrent 35-year extended terms of imprisonment.

The following facts were adduced at defendant's trial. During *voir dire*, the court addressed venireperson Lawrence Becker concerning the possibility of "some involvement" between the court and Becker. The following discussion occurred between the trial judge and Becker:

"Q. [Trial Judge]: I'm in the process of buying a home from Westway Construction Company.

A. [Mr. Becker]: Right.

Q. Is there anything that I have said or done as a customer that is going to influence you in any way in terms of your ability to be a fair and impartial juror in this case?

A. Well, I really don't know, I can't—

Q. In other words, so far nothing has happened with me as a customer, I take it?

A. Right.

Q. You understand it's the lawyers who are going to present the case, and the jurors who are going to decide the facts, and I'm simply going to tell you what the law is?

A. Is there going to be anything in the construction of your home that's going to interfere with our relationship?

Q. I certainly hope not. We have never met before, though; is that correct?

A. That's correct."

The following discussion also took place between the prosecutor and Becker:

"Q. [Prosecutor]: Mr. Becker, are you ready, willing, and able to serve as a juror in this case?

A. [Mr. Becker]: I do have some time restraints that I wasn't happy with this, but otherwise, yes.

Q. And that was going to be one of my next questions is do you have any obligations, what have you, that are distracting you, or perhaps going to—

A. I'm active in my community. For example, tonight I have a planning commission meeting which is to take place shortly.

I also do some bookkeeping on the side, and there is year-end tax situations that I'm confronted with.

Q. And as far as scheduling goes, we hope that this matter finishes sometime Wednesday.

Do you think that you will be able to put these concerns aside and concentrate on the matter at hand?

A. I'd have to."

Becker was selected as an alternate juror. Defendant did not object to Becker's selection. Later, defendant did not object when Becker replaced an ill juror. Nor did defendant raise in his post-trial motion any issue regarding Becker being on the jury.

Also prior to trial commencing, defendant moved to bar the testimony of Joe Gonzalez that defendant had told him that defendant committed robberies for a living and that defendant intended to rob the Saratoga Hotel. The court denied defendant's motion.

The first witness to testify for the prosecution was the victim, Philip Fetzer. According to Fetzer, he was assigned to work at the Saratoga Hotel on July 27, 1990, from 11 p.m. to 7 a.m. as the night auditor and desk clerk. He has no memory of the incident. He remembered saving a computer program at home before going to work. The next thing he recalled was being transferred out of the intensive care unit at the hospital. Fetzer was unable to recognize anyone in the courtroom as the person who shot him, nor was he able to remember having seen defendant. On cross-examination, Fetzer was shown a photograph of defendant but did not recognize him. When asked whether he had ever seen defendant before, he responded that he believed defendant and his family had stayed at the hotel prior to the incident.

Fetzer explained that he had been shot near the right temple. He suffered the loss of sight in his left eye, blurred patches in his right eye, loss of sense of smell and damaged nerves on the right side of his face.

Thomas Fetzer, a North Aurora police officer and the victim's brother, testified that on July 27, 1990, sometime after 5 a.m., he was dispatched to the Saratoga Hotel based on a report of an armed robbery and a subject bleeding from his head. Upon arriving, Officer Fetzer observed his brother lying on the floor and bleeding profusely from the head. The victim was unconscious, had labored breathing, had a rapid and weak heartbeat and appeared to be dying.

After regaining consciousness at the scene, the victim told Officer Fetzer that someone shot him. He described the assailant as a black male armed with a dark-colored revolver. He also told Officer Fetzer that the black male kept telling him to open the safe, and, when the

victim told him he could not do so, the black male starting shouting at him to do it. The black male then shot him.

Officer Fetzer described several photographs that depicted the front counter, the registration area, the cash register and the night clerk's chair. The photographs also showed United States currency on the floor near the chair and a piece of a plastic bag on the chair.

Officer Bill Lomax identified a fingerprint card bearing defendant's name as a "fingerprint card that the Aurora police department maintains for arrestees that come through [the] jail." He further testified that he took the set of fingerprints on the card from defendant on June 10, 1988. Deputy Gerard Casale of the Kane County sheriff's department identified a fingerprint card as containing the fingerprints he took from defendant. Defendant's attorney asked Deputy Casale what date he took the fingerprints, to which Casale responded "in 1988 sometime."

Officer Steven Schindlbeck of the North Aurora police department also responded to the Saratoga Hotel on July 27, 1990, approximately two minutes after being dispatched. He identified in a photograph a dollar bill which was found near the bottom of a staircase located east of the front desk. Additionally, he identified a torn plastic bag depicted in a photograph as one found at the base of two vending machines located alongside the stairway. There was no blood near the torn bag.

Jefferson Wise was called to testify by the prosecution. He testified that he had prior convictions of home invasion, felony deceptive practices, felony retail theft and misdemeanor retail theft. When asked whether he had conversed with defendant regarding the robbery at the Saratoga Hotel, he said no. When shown a written statement given by him to a North Aurora police officer in which he stated that defendant had bragged about robbing the Saratoga Hotel, Wise testified that the statement was false. The statement, which was admitted as substantive evidence, also stated that defendant told Wise about how he was going to spend the money from the robbery.

On cross-examination, Wise explained that he gave the false statement to the police because he wanted to get back at defendant for kicking him out of defendant's house because Wise had stolen defendant's car. Wise changed his mind because he did not feel that a friend of his should do that much time. Wise had left the Aurora area with Joe Gonzalez, who had never met defendant until sometime later when Gonzalez was in jail with defendant.

On redirect examination, Wise denied that defendant had threatened his life in the past. He also could not recall stating at a prior

sentencing hearing that defendant had threatened his life. Wise denied on re-cross-examination that defendant had threatened him concerning his testimony in this case.

Joe Gonzalez testified pursuant to a plea agreement in an unrelated case. His agreement was to tell the truth in this case in exchange for a 30-month extension of probation in two felony cases, a reduction of driving while under the influence to reckless driving and an agreement not to prosecute a theft charge. According to Gonzalez, he first met defendant in the Kane County jail in August 1990. While they were in jail, defendant told Gonzalez that he "committed robberies for a living." Defendant also explained to Gonzalez how he went into the Saratoga Hotel prior to the robbery to see how things were set up because he was going to rob the place. He told Gonzalez his intent was to rob the Saratoga Hotel.

On cross-examination, Gonzalez admitted that defendant told him only that he intended to rob the hotel but never that he had actually done so. Gonzalez further testified that shortly after meeting with the prosecutor in this case he was released from jail and spent Christmas at home. He also admitted that he heard in jail that Jeff Wise had accused defendant of being involved in the Saratoga Hotel robbery.

Inspector Willard Rowe of the Illinois State Police testified that on August 24, 1990, he had a conversation with defendant at the Kane County jail. When asked whether he was involved in the armed robbery at the Saratoga Hotel, defendant denied it but stated that he and his family had stayed there sometime during the winter of 1989. Inspector Rowe then asked defendant to explain why defendant's fingerprints were found at the hotel on July 27, 1990. Defendant's demeanor changed at that point, and he became irrational and upset. Defendant also told Rowe that there was a big mistake and that he was being set up.

Sergeant Charles Larson of the Illinois State Police bureau of crime scene services testified that he collected a torn plastic bag that was draped over a chair behind the reception desk of the hotel. He also collected an amount of United States currency from the floor behind the counter. He also collected a single dollar bill from the floor near a stairway and a torn plastic bag which was located in front of two soft drink machines. He did not see any blood on the plastic bag. The soft drink machines were in an area approximately 50 to 60 feet from the front desk.

James Ercoli, a forensic scientist with the Illinois State Police bureau of forensic sciences, testified that he made observations of the two torn plastic bags and was of the opinion that they may have been

part of one bag at one time. Stephen McKisson, a document examiner and training coordinator for the Illinois State Police crime lab, also inspected the two torn bags for the purpose of determining whether they were from the same bag. Based on numerous points of matching between the two portions of torn bag, he opined that they were at one time a single plastic bag.

James Fazekas, an Illinois State Police forensic scientist specializing in fingerprint examination, testified that he discovered three latent prints on the portion of plastic bag found near the vending machines at the crime scene. Both of the fingerprints on the bag were positively matched to defendant's right ring fingerprint contained on his Aurora police department fingerprint card. The third print, a palm print, did not match defendant's palm print on his Kane County fingerprint card.

Fazekas admitted on cross-examination that there is no way to determine how long defendant's fingerprint was on the bag. He found no latent prints suitable for comparison on the plastic bag found behind the hotel counter or on any of the money collected from the scene. He found no other prints which matched any of defendant's prints.

Following the denial of defendant's motion for a directed verdict, defendant called Reginald Weathersby. Outside the presence of the jury, Weathersby, through his attorney, invoked his fifth amendment privilege against self-incrimination and expressed his intent not to testify.

Defendant's mother testified in his behalf. On July 27, 1990, she resided with defendant, her two handicapped sons and her boyfriend, Gustavo Balderas. On the evening of July 26, 1990, she and her boyfriend went to play bingo at about 6 p.m. At that time, defendant was home with her handicapped sons who require care. When they returned home at 10:30 or 11 p.m., defendant was watching television. She went to bed after coming in and awoke at 8 a.m. the following morning. Defendant was on the sofa at that time. Gustavo Balderas, defendant's mother's boyfriend, corroborated her testimony regarding defendant being at home. He also testified that to his knowledge defendant never left the home that evening. Defendant did not testify.

The jury began its deliberations at about 4:15 p.m. A photocopy of the front of defendant's North Aurora police fingerprint card was given to the jury. The portion referring to retail theft was whited out. The court explained to the jury that if it wanted to eat around 6 p.m. it would have to order food around 5 p.m. because it takes about an hour to get meals delivered. The jury found defendant guilty

of all three counts. At that time, the court noted that the food for the jury would arrive in five minutes.

Defendant filed, on February 5, 1991, a *pro se* "motion to dismiss counsel and motion for appointment of counsel." On that same date, he also filed a *pro se* "motion in arrest of judgment and motion for a new trial." Defendant's attorney also filed an amended motion for a new trial. The trial court dismissed defendant's *pro se* motions with the exception that it reserved ruling on the allegation that defendant's trial attorney withheld evidence that would have proved defendant's innocence. New counsel was appointed to represent defendant in that regard. In dismissing the *pro se* motion to dismiss counsel and appoint new counsel, the court found that defendant's trial counsel's decision to advise defendant not to testify was a matter of trial tactics.

On March 14, 1991, the court conducted a hearing on the amended motion for a new trial and on the remaining *pro se* allegation that defendant's trial counsel withheld exculpatory evidence. Defendant was represented on the *pro se* allegation by appointed counsel different from his trial counsel. In the latter regard, defendant testified that Reggie Weathersby had actually performed the crimes charged and that defendant's trial counsel knew about Weathersby's involvement. Specifically, defendant referred to partial fingerprints of Weathersby that defense counsel had determined were from the crime scene. According to defendant, defense counsel told him that the partial prints belonged to Weathersby but that such evidence would not hold up in court.

On cross-examination, defendant admitted that defense counsel had mentioned points of identification regarding the fingerprints and that their retained expert only found one point of identification between Weathersby's prints and a print taken from the crime scene. Defense counsel also told defendant that such identification was insufficient to be admissible. On redirect examination, defendant testified that he asked defense counsel to offer the fingerprint identification regarding Weathersby into evidence but defense counsel refused to do so.

Defendant's trial attorney, Keith Brown, testified that defendant first told him about Weathersby about three weeks prior to trial. Brown then discovered that the State had never compared Weathersby's fingerprints to any of the prints found at the crime scene. Brown arranged to have a private fingerprint examiner compare Weathersby's finger and palm prints with those from the crime scene. According to Brown, the examiner advised him that there was one print at

the scene that had one or two points of comparison that were the same as one of Weathersby's prints but that that was insufficient for admissibility. Brown, in turn, explained that to defendant. Brown further testified that, as part of his trial strategy, he recommended to defendant not to testify. He did so because he felt the State's evidence was not strong enough to convict defendant, because defendant's testimony might have bolstered the State's evidence and because cross-examination of defendant would have raised potentially unexplainable issues.

In denying defendant's *pro se* motion, the court ruled that Brown's decisions regarding the fingerprint evidence and defendant's testimony were matters of trial strategy and that defendant received adequate representation.

On April 18, 1991, the court conducted a hearing on defendant's amended motion for a new trial and a sentencing hearing. The court denied defendant's amended motion.

As to sentencing, the court considered defendant's presentence investigation report. The presentence investigation report discloses that defendant was adjudicated delinquent in 1985 based on an aggravated battery charge. As an adult, he had one traffic conviction and two misdemeanor convictions. Defendant has an 11th-grade education with no vocational training. He lived with his mother and his twin handicapped brothers, whom he cared for while his mother worked.

Officer Al Tiegelmann testified for the State that he spoke with Jeff Wise on August 9, 1990, at the Kane County jail. Wise told him that Wise and defendant were involved in a home invasion on June 7, 1990. On cross-examination, Officer Tiegelmann acknowledged that the victims of the home invasion were unable to identify defendant in a photographic lineup.

Detective Peter Burgert testified that he investigated a home invasion that occurred on June 26, 1990. Pursuant to that investigation, he recovered a lady's shoulder purse from the crime scene which contained, among other things, a roll of duct tape. Jeff Wise told Detective Burgert that the purse had belonged to defendant's mother. A fingerprint examiner from the State crime lab was able to match a fingerprint on the tape to one of defendant's fingerprints. On cross-examination, Detective Burgert admitted that the victims were unable to pick defendant's photograph out of a photographic lineup.

Several witnesses, including defendant's mother, testified to defendant's good character. Defendant's mother also testified that defendant provided care for his two handicapped brothers.

Defendant also testified in his own behalf. After being admonished that his testimony could be used against him in a retrial, defendant testified that at 3 a.m. on the date of the incident he was at his house when Reggie Weathersby stopped by. According to defendant, Weathersby asked him to go to a restaurant to eat, and defendant agreed. When defendant got in Weathersby's car, there was a plastic bag on the front seat which he picked up and threw in the backseat.

As they neared the restaurant, Weathersby revealed his plan to rob the Saratoga Hotel. Defendant refused to go along, exited the car and walked home. At about 5 p.m. that evening, Weathersby told defendant that when he robbed the Saratoga Hotel he was drunk and the gun went off accidentally. Weathersby panicked, ran and left the money and bag there.

Defendant testified that he had not come forward with the information earlier because he was afraid of doing so while in jail. According to defendant, Weathersby told him not to worry, that he would tell the truth as to who robbed the Saratoga Hotel.

The court began its sentencing comments by noting that it did not consider defendant's continued claims of innocence to be detrimental to his sentencing. The court stated that it considered all aggravating and mitigating factors. Specifically, the court considered defendant's misdemeanor offense in aggravation. It also found that the fact the victim was shot was an aggravating factor as to the armed robbery conviction. The court found no mitigating factors to be present in the case. In that regard, the court stated that while defendant helped with his brothers there was no evidence that he had primary responsibility for their care and there was no explanation why defendant's mother or stepfather could not help or why no assistance was obtained from various social service agencies.

In considering whether to give an extended-term sentence, the court initially stated that it "[could] not find that the conduct of the defendant was exceptionally brutal or heinous." The court further noted that defendant's conduct caused serious harm and that defendant, "arguably, received compensation." The court also commented that, while modest, there was "a history of prior delinquency or criminal activity." The court sentenced defendant to a concurrent 35-year extended term of imprisonment on the armed robbery and attempted murder convictions and vacated the armed violence conviction.

The first issue we address is whether defendant was denied a fair and impartial jury. Defendant maintains that because of a business relationship between the trial judge and one of the jurors, the juror,

"who quite possibly feared the loss of business should a not guilty verdict result," unfairly influenced the other jurors to find defendant guilty. In a closely related argument, defendant contends that the same juror also unfairly influenced the jury to find defendant guilty because the juror was pressed for time. Defendant also argues that his trial counsel was ineffective for failing to challenge the juror for cause.

The failure to challenge a juror for cause or to exercise a peremptory challenge waives any objection to that juror. (*People v. Ford* (1960), 19 Ill. 2d 466, 475; see *Kingston v. Turner* (1987), 115 Ill. 2d 445, 465.) Furthermore, the failure to challenge a juror for cause is strong evidence that counsel was convinced the juror was not biased and had not formed an opinion of the defendant's guilt. *People v. Torres* (1973), 54 Ill. 2d 384, 389.

In the present case, the trial judge initiated a discussion with juror Lawrence Becker relating to the judge's purchase of a home from Becker's employer, a construction company. Defense counsel did not challenge this juror based on his apparent business relationship with the judge, and, as such, any challenge on that basis was waived. Likewise, defense counsel did not assert a challenge when the juror stated that he had "some time restraints that [he] wasn't happy with this" and that he would "have to" put his personal and professional concerns aside in serving on the jury. Any challenge based on Becker's having indicated a propensity to reach a speedy verdict was also waived.

■ Notwithstanding any such waiver, the bases for challenging Becker for cause now raised on appeal are without support in the record. There is nothing in the exchange between the judge and the juror concerning the purchase of the judge's home that remotely suggests any bias or predisposition on the part of Becker. We also strongly disapprove of appellate counsel's assertion that Becker sought to preserve his employer's business relationship with the judge by rendering a guilty verdict. Such assertion necessarily implies an opinion on the part of the trial judge that defendant was or should be found guilty. Such a bald implication of judicial predisposition without any evidentiary support is beyond the realm of acceptable advocacy and should be avoided.

There is also no evidence demonstrating Becker's desire to reach a speedy verdict. His stating that he would "have to" put his own concerns aside, without more, is nothing more than an acknowledgement of his duties as a juror. The additional statement that Becker had some time restraints that made him unhappy about being a juror

does not evidence Becker's inclination to hurry the deliberations. Standing alone, these two statements would not be sufficient cause to have excluded Becker as a juror. Similarly, the fact that the jury appears to have returned a guilty verdict in less than two hours fails to demonstrate any undue influence exercised by Becker on the other jurors.

We accordingly turn to defendant's contention that his defense counsel was ineffective for failing to challenge Becker for cause on these two bases. To show ineffective assistance of trial counsel, a defendant must prove that trial counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive the defendant of a fair trial. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) As discussed above, there was no legitimate basis for challenging alternate juror Becker for cause. Consequently, the failure to do so did not rise to the level of ineffective counsel as defined in *Albanese*.

The next issue is whether defendant was denied a fair trial as a result of the combination of the testimony of two police officers regarding defendant's fingerprint cards and another witness' testimony that defendant told him that defendant committed robberies for a living. While defendant concedes that evidence of other crimes is admissible to prove motive, intent, *modus operandi*, identification, plan or design, he contends that the use of the fingerprint cards was unnecessary to establish his identity, and, therefore, the officers' testimony concerning the cards unfairly prejudiced him. He maintains the introduction of the statement regarding his admitting doing robberies for a living lacked similarities to the charged offense sufficient to render it probative of his motive or intent in this case.

We begin our analysis by pointing out that to preserve properly a trial error for appellate review a defendant must both object at trial and raise the issue in his written post-trial motion. (*People v. Pecoraro* (1991), 144 Ill. 2d 1, 17; *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Here, defendant failed to object to the testimony regarding the fingerprints. Thus, the issue now presented related to the fingerprint cards was waived.

Nevertheless, there is an exception to the waiver rule where the evidence is closely balanced or the alleged error is of such magnitude to have deprived the defendant of a fair and impartial trial. (*Pecoraro*, 144 Ill. 2d at 17.) We need not decide in this case whether such plain error existed as we do not consider any error to have occurred here.

Generally, evidence of other crimes is inadmissible if relevant merely to establish a defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) Evidence of other crimes is admissible, however, to establish *modus operandi*, intent, identity, motive or absence of mistake. (*People v. Evans* (1988), 125 Ill. 2d 50, 82.) The supreme court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. *Evans*, 125 Ill. 2d at 82.

■ In this case, defendant argues that references to a fingerprint card from the Aurora police department and a fingerprint card from the Kane County sheriff's department, both generated in 1988, evidenced his having committed other crimes. Officer Lomax identified a fingerprint card bearing defendant's name as one used by the Aurora police department "for arrestees that come through the jail." He added that he took the fingerprints from defendant in 1988. While this testimony suggests that defendant had in fact committed another offense prior to the charges in this case (see *People v. Hudson* (1972), 7 Ill. App. 3d 333, 337), it does not imply the precise nature of the offense. We have previously held that when the evidence of prior criminality is inferential and not direct, the dispositive issue as to the propriety of admitting such evidence depends upon the probative and prejudicial effect of the nexus between the admitted evidence and the prior criminality. (*People v. Bartels* (1975), 30 Ill. App. 3d 551, 555.) Here, the mere inference that defendant had committed some offense in the past, without some suggestion as to the nature and circumstances of that offense, fails to rise to a level of prejudice sufficient to overcome the obvious probative value such evidence provided in connecting defendant to this crime. It may very well be that defendant's fingerprints were on an arrest card at the Aurora police department as a result of some minor offense or because of his failure to post bond on a traffic offense. Without any further indication as to the basis for his fingerprints on the arrest card, there is insufficient evidence of defendant having committed a prior criminal offense, evidence of which would have unduly prejudiced him in this case.

Even if it was error for the State's witness to have referred to defendant's fingerprint card as being one used for "arrestees," any error was harmless under these circumstances. Officer Lomax's reference to the fingerprint card as one used for arrestees was the only evidence to that effect. While the State's fingerprint examiner testified that she used the Aurora police department fingerprint card to identify defendant's fingerprint on the plastic bag, such reference was even less specific than Lomax's as to any inference that defendant

had been involved in prior criminal activity. There was no additional mention in the State's case, or in its closing argument, of the specific nature of the fingerprint card. Furthermore, the reference to the card as one used for arrestees did not give rise to a strong inference, if any, that defendant had actually been arrested for a criminal offense more serious than a minor misdemeanor or traffic offense. Accordingly, we cannot conclude that defendant suffered the level of prejudice likely to have affected the outcome of his trial.

■ Without unnecessary elaboration, we further conclude that Deputy Casale's testimony that he took defendant's fingerprints on a separate fingerprint card for the Kane County sheriff's office was not error. The mere mention of this fingerprint card which was used at trial to exclude defendant's palm print as being identical with a latent palm print obtained from the crime scene, without more, does not imply that defendant had committed a prior crime. There are a variety of reasons for a police department to have fingerprints on file other than those of an arrestee. (*People v. Prewitt* (1987), 160 Ill. App. 3d 942, 949.) Accordingly, we find no error in the admission of Deputy Casale's testimony under these circumstances.

■ Defendant also asserts that the testimony of Joe Gonzalez that defendant told Gonzalez he committed robberies for a living was error. As noted earlier, evidence of other crimes is inadmissible except to establish *modus operandi*, intent, identity, motive or absence of mistake. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) In the present case, defendant's statement that he commits robberies for a living is particularly relevant to his motive for committing the robbery in this case. While motive is not an essential element of a crime, any evidence that tends to show that an accused had a motive for committing the crime is relevant because it renders more probable that defendant in fact committed the offense. (*People v. Smith* (1990), 141 Ill. 2d 40, 56.) The fact that defendant may have committed robberies as a regular source of income makes it more probable that he committed the one in this case. Moreover, the statement concerning committing robberies was made in conjunction with and arguably lent meaning and significance to defendant's further statement to Gonzalez that he intended to rob the Saratoga. As such, Gonzalez' testimony was not erroneously admitted.

In so holding, we note that defendant's reliance on *People v. Phillips* (1989), 127 Ill. 2d 499, *People v. Matthews* (1985), 137 Ill. App. 3d 870, and *People v. Watson* (1981), 98 Ill. App. 3d 296, is misplaced as all of those cases address the applicability of the *modus operandi* exception to other crimes evidence. *Modus operandi*, by its

very definition, requires evidence of the particular methods of performing a criminal act. We perceive no reason to engraft the similarity-of-crimes requirement of that exception onto the motive exception applicable in this case.

Defendant's next contention is that the trial court erred in failing to appoint new counsel to represent him in his *pro se* motion alleging ineffective assistance of trial counsel. Our supreme court has held that the failure to appoint new counsel to argue the defendant's *pro se* post-trial motion alleging ineffective assistance of counsel can be error under certain circumstances. (*People v. Nitz* (1991), 143 Ill. 2d 82, 134, citing *People v. Krankel* (1984), 102 Ill. 2d 181.) In *Nitz*, the supreme court adopted the approach of several appellate decisions (see, *e.g.*, *People v. Washington* (1984), 184 Ill. App. 3d 703) which concluded that there is no *per se* rule that new counsel must be appointed every time a defendant presents a *pro se* motion for a new trial alleging ineffective assistance of counsel. (*Nitz*, 143 Ill. 2d at 134.) Rather, in determining whether new counsel should be appointed, the trial court should examine the factual matters underlying a defendant's claim. If the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed. (*Nitz*, 143 Ill. 2d at 134.) If, however, the allegations show possible neglect of the case, new counsel should be appointed. *Nitz*, 143 Ill. 2d at 134.

Accordingly, we apply the analysis enunciated in *Washington* and adopted in *Nitz* to the facts of this case. Here, defendant's handwritten, *pro se* motion to dismiss counsel and appoint new counsel alleged, in part, that his trial counsel was ineffective because he "refused to allow" defendant to testify when he knew defendant's testimony would have demonstrated the guilt of Reggie Weathersby. Defendant's handwritten, *pro se* motion in arrest of judgment and for a new trial also alleged that trial counsel "refused to allow" defendant to testify and "deceived defendant into believing that his chances were better if he did not testify."

At a subsequent proceeding, the court engaged in a discussion with defendant as to whether defendant wanted to persist in his allegations of ineffective assistance of trial counsel. Defendant initially told the court that he did not want his trial attorney dismissed and that he was satisfied with him. In further discussing with defendant trial counsel's performance, the court explained to defendant that even if he had taken the stand and intended to testify regarding Reggie Weathersby, his testimony would have either implicated himself as an accomplice or would have been inadmissible hearsay. At that point, the trial court considered trial counsel's refusal to allow defendant to

testify as a matter of trial strategy. Upon further discussion with the court, defendant stated that everything in his motion was true but that he did not want to dismiss trial counsel. After argument by both counsel, the trial court found that defendant's claim of ineffective assistance of counsel lacked merit and that it pertained to a matter of trial strategy. The court, therefore, refused to appoint new counsel on that issue.

■ We have reviewed the motions and record on this issue and conclude that the trial court properly applied the law and reached the correct disposition of defendant's claim of ineffective assistance of trial counsel. Absent some evidence that trial counsel actually refused to allow defendant to testify against defendant's wishes, his apparent advice to defendant not to do so was merely a matter of trial strategy. As a general rule, a trial counsel's advice as to whether a defendant should take the stand is uniquely one of trial strategy. We see nothing in the facts of this case to conclude otherwise.

We next address the issue of whether defendant was proved guilty beyond a reasonable doubt of armed robbery and attempted murder. In this regard, defendant raises three contentions in an effort to demonstrate the weakness of the State's evidence. First, he argues that Jeff Wise's testimony is "wholly unworthy of belief" because he recanted his statement to the police at trial and because the statement itself was ambiguous and did not specifically pertain to the charged offense. Second, he maintains that Gonzalez' testimony is suspect because of the "very sweet deal" he arranged with the prosecution, because there was no corroborative evidence to support Gonzalez' statement that defendant had gone to the Saratoga Hotel before the date of the robbery to look the place over and because Gonzalez did not testify to any specific aspects of the offense that would completely implicate defendant. Lastly, defendant asserts that the fingerprint evidence placing him at the crime scene was explained by defendant at the sentencing hearing.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Morgan* (1991), 142 Ill. 2d 410, 439.) It is not the function of the reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*Morgan*, 142 Ill. 2d at 439.) Rather, determinations of the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*Morgan*, 142 Ill. 2d at 439.) The relevant question on appeal is whether, after viewing the evi-

dence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191.) This reasonable doubt test should be applied in all criminal cases, whether the evidence is direct or circumstantial. *People v. Pintos* (1989), 133 Ill. 2d 286, 291.

■ In this case, there was evidence sufficient for a rational trier of fact to have found defendant guilty beyond a reasonable doubt. While Jeff Wise testified that his earlier statement to the police that defendant had bragged about robbing the Saratoga Hotel was false, that statement was admitted as substantive evidence. Even though Wise explained why he gave the police statement earlier, the question of whether to believe Wise's trial testimony or his prior statement was one uniquely in the jury's realm. Likewise, the jury was aware that Gonzalez testified against defendant in exchange for an extension of his probation in an unrelated case, a reduction of a charge and an agreement not to prosecute a theft charge. It was for the jury to decide whether to believe Gonzalez and how much weight, if any, to give to his testimony.

As to the fingerprint evidence, it established defendant's unexplained presence at the scene of the armed robbery and attempted murder. Furthermore, his fingerprints were on part of a plastic bag which appeared to have been used in the crime itself as the other part of the bag was found on a chair behind the counter and with money apparently from the hotel scattered around. While defendant argues in his appellate brief that we should consider his explanation for why his fingerprints were on the bag, which explanation he first offered at his sentencing hearing, we decline to do so. We are aware of no authority that compels us to consider such evidence, and we think the reasons for not doing so are too numerous and too obvious to mention. When viewed in its entirety, the evidence in this case supports the jury's determination that defendant was guilty of armed robbery and attempted murder beyond a reasonable doubt.

The last contention presented by defendant is that the trial court abused its discretion in sentencing him to a 35-year extended-term sentence because: (1) he had only three prior misdemeanor convictions; (2) he maintained his innocence and testified at the sentencing hearing as to Reggie Weathersby's commission of the offense; and (3) the trial court failed to give proper weight to the mitigation evidence and his potential for rehabilitation. Section 5—5—3.2(b) of the Unified Code of Corrections provides that a sentencing court may consider various factors as reasons to impose an extended-term sentence. (Ill.

Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b).) The only factor listed therein that arguably applies in this case concerns a defendant's conviction of a felony and the court's finding "that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(2).) The infliction of torture or unnecessary pain is not required to find that a crime was brutal or heinous. (*People v. Benkowski* (1991), 215 Ill. App. 3d 615, 620.) Rather, "brutal" is defined as grossly ruthless, devoid of mercy or compassion and cruel or cold-blooded. (*Benkowski*, 215 Ill. App. 3d at 620.) "Heinous" is defined as hatefully or shockingly evil, grossly bad or enormously and flagrantly criminal. (*Benkowski*, 215 Ill. App. 3d at 620.) Consequently, premeditation and cold-bloodedness are sufficient factors to justify an extended sentence. *Benkowski*, 215 Ill. App. 3d at 620-21.

A trial court need only find a single required factor in aggravation to impose an extended-term sentence. (*Benkowski*, 215 Ill. App. 3d at 621.) While the statutory requirement that the trial judge set forth on the record his reasons for a particular sentence does not obligate the judge to recite each factor and set a value on it (*People v. Garrison* (1991), 209 Ill. App. 3d 979, 982), the judge must nevertheless enumerate on the record his consideration of the requisite aggravating factors in imposing an extended-term sentence. *People v. Hanna* (1989), 185 Ill. App. 3d 1069, 1078.

■ In this case, the trial court stated on the record that it "[could] not find that the conduct of the defendant was exceptionally brutal or heinous, indicative of wanton cruelty." The court then went on to consider "the provisions of Chapter 38, Section 1005—8.2 [*sic*]." The court added that "[e]xtended term, assuming appropriate factors are found under 1005—8.2 [*sic*], is thirty to sixty years." Finally, the court stated "that based on everything the Court has considered, and all of the statutory provisions *** the defendant is hereby sentenced to an extended term of thirty five years."

We are unable to ascertain from the record what the trial court considered as a basis for the imposition of the extended-term sentence. It appears from the court's comments that it did not consider defendant's conduct to be exceptionally brutal or heinous. There is also some indication that the court may have erroneously applied the statutory aggravating factors relevant to the imposition of a normal-term sentence as a basis for the imposition of an extended-term sentence. On the other hand, there is some evidence which would arguably support a trial court's finding that defendant's conduct was exceptionally brutal or heinous. It is apparent that the record is am-

biguous at best as to the basis for imposing an extended-term sentence. Under these circumstances, we conclude that it is necessary to remand this cause for resentencing. In doing so, we are careful to express no opinion as to what sentence should be imposed or whether an extended-term sentence would be appropriate in this case. We further note that to the extent the trial court considered defendant's receipt of any proceeds of the armed robbery as an aggravating factor, it erred in doing so. See *People v. Hunt* (1981), 100 Ill. App. 3d 553, 557-58.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County finding defendant guilty of armed robbery and attempted murder, reverse that part of the judgment sentencing him to two 35-year extended terms of imprisonment, and remand this cause for resentencing.

Affirmed in part; reversed and remanded in part.

INGLIS, P.J., and UNVERZAGT, J., concur.