THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SHEILA SMITH, Defendant-Appellant.

Second District   No. 2—90—1207

Opinion filed February 19, 1993.

Patrick J. Hughes and Theodore Gottfried, both of State Appellate Defender's Office, of Springfield, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Sheila Smith, pleaded guilty to murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)). The court sentenced her to an extended term of 60 years' imprisonment. Defendant appeals, contending that the court abused its discretion in imposing the 60-year sentence by failing to consider several mitigating factors in determining the proper sentence.

A Lake County grand jury indicted defendant and Ricky Irby, Sr., on one count of murder of their infant son, Quinten Irby. Codefendant went to trial and was convicted based on accountability. This court affirmed codefendant's conviction and sentence in *People v. Irby* (1992), 237 Ill. App. 3d 38.

Most of the facts surrounding Quinten's murder are contained in *Irby*. In summary, on May 31, 1984, three-month-old Quinten Irby suffered severe injuries to his face, mouth, esophagus, trachea and lungs as the result of being force-fed a caustic substance while in the care of defendant, Sheila Smith. Quinten remained in Children's Memorial Hospital for 27 months where he was treated for various problems stemming from those injuries and died as the result of them on August 26, 1986. The two possible theories regarding how the caustic substance was administered were: (1) acid was mixed with Quinten's bottle of Similac (milk) and ingested by Quinten by sucking his bottle, or (2) the acid was poured directly into Quinten's mouth, without mixing the acid with Similac. Additional facts presented during the proceedings against defendant will be stated throughout this opinion.

Defendant pleaded guilty to murder. Pursuant to the plea agreement, defendant agreed to testify in the trial against codefendant. Additionally, the State agreed not to seek the death penalty against defendant and agreed it would not seek a sentence greater than 65 years.

Both sides presented numerous witnesses and evidence at defendant's sentencing hearing. Defendant presented Dr. Kenneth Siegesmund, an associate professor of anatomy at the Medical College of Wisconsin, as her opening witness. Dr. Siegesmund testified that he examined Quinten Irby's medical reports and pathologist reports and was familiar with Quinten's condition before death. Dr. Siegesmund conducted an experiment consisting of adding battery acid with vary-

ing acidic strengths to four bottles containing four ounces of Similac, shaking the bottles, and refrigerating them over night. The bottles were heated the next morning and subsequently photographed opposite a bottle of nontainted Similac, which was similarly shaken and heated. Dr. Siegesmund further testified that he had examined some baby bottle nipples in connection with this case, measured the quantity of liquid the nipples contained, and found it to be .12 ounces. In Dr. Siegesmund's opinion, .12 ounces represented how much liquid floats through a bottle nipple in a baby's suck. Based on his experiments, Dr. Siegesmund opined that, within a reasonable degree of medical or scientific certainty, an acidic level of .1 or lower caused Quinten's injuries and that .1 to .2 milliliters of liquid at the .1 acidic level caused Quinten's injuries. On cross-examination, Dr. Siegesmund admitted that he was not a pediatrician and not an expert regarding babies and how they are fed.

After Dr. Siegesmund concluded his testimony, both sides acknowledged their reading of the presentence investigation report. The report includes, *inter alia*, a reference that codefendant filed a products liability lawsuit in August 1987 for the alleged negligent death of Quinten and that such lawsuit was the motivating factor for Quinten's injuries and death. The report also states that defendant denied any knowledge of the lawsuit at the time it was filed. The report further stated defendant had no prior criminal or delinquency convictions. A report by Mary K. Stucko and Steven M. Julius of the Department of Children and Family Services, attached to the presentence report, described defendant's family as providing a "supportive, close-knit family environment."

Defendant then introduced a psycho-social report prepared by Cessie Alfonso of the Clinical and Human Resource Development Consulting Firm in Jersey City, New Jersey. The Alfonso report states that defendant was born and raised initially in Mississippi. Defendant lived in Mississippi until the age of four, which was upsetting as defendant and her siblings were living with different relatives and friends while her parents searched for work in Illinois, therefore missing a "real family" life. After the age of four, defendant and her siblings moved to Illinois with their parents. Defendant was spoiled by her family, especially by her father whom she admired a great deal. When referring to her mother, defendant indicated, "I am just like my mother, she speaks her mind and I do the same." Defendant remembered when she and her mother would get into fights both verbal and physical, which began when her parents separated and later di-

vorced. Defendant's mother eventually moved out of the family home, leaving the children with defendant's father.

According to the Alfonso report, after defendant's mother eventually returned home, defendant's father was suspicious that the mother was having an affair. This suspicion was reinforced when defendant told her father that her mother had a boyfriend. When defendant's father caught defendant's mother sitting in a chair with another man, defendant's father broke a chair on defendant's mother's back. This incident led to the end of the marriage between defendant's parents. The Alfonso report states that, as a result of defendant's parents' problems and her difficulties adjusting to her family status, defendant began to rebel against her mother, school and classmates. She became involved in fights more frequently and blamed her mother for her parents' separation.

The Alfonso report also states that defendant began school at the age of five and eventually graduated from North Chicago Community High School. Defendant indicated that she was an average learner who, if she had applied herself more, would have excelled further in school. Defendant also reported that she had attended a six-week nursing assistant program which provided her with minimal skills. The Alfonso report opined that defendant functioned at a low intellectual level, which explains her strong dependency needs.

The Alfonso report also relates that at age 16 defendant met codefendant Ricky Irby, Sr., while attending high school. Codefendant was initially very nice to defendant but eventually turned sadistic and abusive. Codefendant's drug use and physical and sexual assaults on defendant made matters worse. Codefendant's abuse started shortly after defendant became pregnant with the couple's first child, Ricky Jr. Codefendant did not financially support defendant or the couple's children. Defendant's parents and siblings assisted her financially and purchased items for defendant's children. Defendant relied heavily on her brother, Sam Smith, to protect her from codefendant when codefendant would attack defendant. The report also reflects that defendant tried to leave codefendant on several occasions but usually returned because she loved him. Codefendant was defendant's first boyfriend and at times was very good toward her.

A section of the Alfonso report entitled "Research Relevant to the Offense" indicates that defendant was a victim of "Battered Women's Syndrome." According to the report, battered women have a tendency to believe in the omnipresence and strength of the battering mate. The report indicates this was particularly relevant in defendant's case because even though defendant believed that code-

fendant was the moving force in the death of Quinten Irby and although defendant had been separated from codefendant at the time of Quinten's injuries, defendant still had an extraordinarily difficult time admitting codefendant's role in the murder. Consequently, defendant would frequently exhibit a pattern of denial where codefendant was concerned.

One factor of battered women's syndrome, according to the report, is "learned helplessness," wherein abused women learn from the roles and behaviors that they see in their households and families and learn to accept and tolerate violence and expect it in their relationships with men. As a result of this learned helplessness, battered women easily fall prey to their mates' coercion and intimidation and have no means of resisting demands to do things against their will and interest. The Alfonso report also indicated that prior to defendant's involvement in this crime, defendant's children, Ricky Jr. and Quinten, showed no evidence of abuse or neglect, establishing that defendant's participation in the crime in question was in part due to dependency pressures.

In aggravation, the State presented Susan Campbell, who was then serving a sentence in the Lake County jail for driving under the influence of alcohol and driving on a revoked license. In May 1990, she was in jail at the same time as was defendant. Campbell testified that she heard defendant say that defendant would "kick the baby out of the stomach" of a pregnant jail guard.

James McKinnon, a fire fighter and paramedic for the City of North Chicago, testified that he was on duty May 31, 1984. At 9 a.m. he and his partner responded to a call at 2135 Wallace in North Chicago. McKinnon saw defendant and another female standing on the front curb with a baby in defendant's arms. Defendant appeared calm and uncaring. On the way to the hospital, defendant sat in the front passenger seat of the ambulance next to McKinnon. Defendant remained calm and never looked to the back of the ambulance to check on Quinten. Defendant never asked the paramedics how Quinten was doing, nor did she act upset or excited. According to McKinnon, defendant never expressed any concern for Quinten during the ride to the hospital.

Nancy Marble, a registered nurse at Children's Memorial Hospital, testified that she was Quinten's primary nurse from March 1985 to the time of Quinten's death in August 1986. She worked closely in Quinten's care and was familiar with defendant and codefendant. Marble testified that defendant did not visit Quinten very often during the 1½ years Marble cared for Quinten. Defendant did not visit at

all from June 16 through August 1985. Marble also testified that "quite a few times" defendant would call, stating she would be visiting Quinten, but would not come. Marble recalled Christmas Eve 1985, when defendant called saying she was buying Christmas presents for Quinten and would visit Quinten on Christmas, but did not do so. During the 1½ years Marble cared for Quinten, defendant very rarely bought any gifts, clothes or any other items for Quinten.

In November 1985, Quinten had a respiratory problem and a cardiac arrest. Quinten was sent to the intensive care unit for monitoring. Marble had difficulty contacting defendant to inform defendant of Quinten's cardiac arrest. Two days later, defendant returned to the hospital and packed up Quinten's clothing, toys, and other items that were placed in Quinten's bed, stating that she was going to take them home. Marble stated that defendant was trying to collect these items, which other people had bought for Quinten, even though Quinten was still alive at the time.

Marble also testified that many times she and the nursing staff would try to contact defendant regarding Quinten's condition, e.g., for consent for various procedures, but were unsuccessful, despite repeatedly informing defendant to give telephone numbers where defendant could be reached. Marble also testified that she had difficulty contacting defendant on the day Quinten died. Marble admitted on cross-examination that she did not know if defendant had a driver's license or access to any vehicle, nor was she aware of defendant's financial situation. Marble also related that defendant made telephone calls every day or other day during the lengthy intervals when defendant did not visit Quinten.

A copy of Children's Memorial Hospital's "nurse-parent" communication records demonstrates defendant visited Quinten approximately 20 times during Quinten's hospitalization. The records also reflect defendant made numerous telephone calls. Notations for February 6, 1985, set forth that defendant stated "Five hundred formula bottles with acid in them for the company. Quinten was the only one who got any." Notes from October 1985 reflect that defendant called to state she took an entire week off of work to be with Quinten. The records show defendant did not visit Quinten that week. On October 22, 1985, defendant called to state that she would always get a cold before she would see Quinten and that was why she had not been visiting him that frequently. Notes from October 24, 1985, indicate that defendant called the hospital and was informed that Quinten had a very bad time breathing and was in great distress most of the day. Defendant replied, "Call me if he gets worse." When the nurse

asked what defendant meant by "worse," defendant replied, "Call me if I need to come to the hospital."

The State next presented transcripts of testimony from Dr. Michael Oster and Dr. Carol Gerson; both transcripts were taken from codefendant's trial. Dr. Oster was the emergency room physician at St. Therese medical center in May 1984 and treated Quinten immediately upon his admission to the emergency room. Quinten had labored breathing, and Dr. Oster noticed immediately chemical burns on the skin of Quinten's lip and chin and inside the baby's entire mouth and back of his throat. Dr. Oster stated: "The injury would have had to have been new, the reason being is a chemical burn such as that causes swelling and edema." Consequently, Dr. Oster stated that Quinten's injuries probably occurred less than one hour before Quinten was brought to the hospital.

Defendant gave a history to Dr. Oster that Quinten was fed the night before and developed difficulty breathing in the morning. Dr. Oster stated that Quinten's injuries could not have happened the way defendant stated because if Quinten was fed with the tainted formula the night before, Quinten's airway would have been swollen shut and he would have died during the night. Therefore, Dr. Oster stated that the tainted substance had to have been given to Quinten that same morning.

Dr. Oster also opined that a child would have a painful response upon contact with the caustic substance and a person with a child would know immediately if the child was in pain. Dr. Oster also stated that if the tainted substance had come through a nipple, a child of Quinten's age would suck approximately 1½ cc's of fluid and would have reacted immediately. However, Dr. Oster stated that the extent of the damage to Quinten's body showed approximately 15 to 30 cc's were ingested. Consequently, Dr. Oster did not believe that Quinten's injuries were caused through a nipple in a baby's bottle. Rather, Dr. Oster stated:

> "It would have had to have been put in his mouth by someone adept enough at getting the entire volume inside the mouth with no burns anywhere else. We examined him from head to toe and there were no other burns. All of the burns were right by the lip and in the mouth. So it would have had to be someone who could get the acid in there and nowhere else. There was no other spills [sic].
>
> * * *
>
> Well, I would say that it was a strong acid because the burns were strong and in emergency medicine I have had much expe-

rience with people coming in for chemical burns and the more dilute or the more strong an acid will determine the extent of burn and this was an extensive burn. It was a deep burn. So this was what we call a strong acid."

Dr. Oster stated someone would have had to have force-fed Quinten without spilling the caustic substance. Perhaps a baster or a bottle without a nipple or lid was used to pour the substance in Quinten directly. Dr. Oster requested a nurse to send a police officer to defendant's home to look for anything that could have caused the injury, because Dr. Oster suspected that there was something wrong with defendant's history of Quinten's injuries versus Oster's examination of Quinten's condition.

Dr. Gerson testified that she was a pediatric otolaryngologist (ear, nose, and throat specialist) employed at Children's Memorial Hospital in June 1984. Quinten had respiratory distress from his first day of admission, never breathed on his own, and got progressively worse. During Quinten's first year of hospitalization, 19 bronchoscopies were performed. Quinten's right bronchus, which leads to the right lung, closed down very rapidly. The ability of air to get to that lung was so severely impaired that it was difficult to assess what the actual lung function was. Quinten's right lung had to be removed in July 1984 because the pathway for air to get to it was completely closed down. Bronchoscopies ceased after the first year because there was nothing more the doctors could do for Quinten. Quinten continued to be in a very precarious condition his entire stay. Standard tracheotomy tubes could not be used to ventilate Quinten; therefore, makeshift tracheotomy tubes had to be used. Constant battles with adjusting the tube occurred, with only the ear, nose and throat surgeons capable of changing the tube because of such difficulty. Moving Quinten around would sometimes change the position of the tube; it would be impossible to ventilate him and his heart rate would fall and Quinten would have to be emergently adjusted.

Dr. Gerson also stated that a baby of Quinten's age would get less than 1 cc of liquid in a single suck from a bottle's nipple. Dr. Gerson opined that it would be very hard to imagine that less than 1 cc could have caused Quinten's burns. Dr. Gerson stated Quinten had to have ingested significantly more than that amount and that a three-month-old baby would not suck twice on a bottle containing something as caustic as this substance obviously was. Dr. Gerson concluded by stating that Quinten's injuries were consistent with somebody force-feeding the caustic substance directly into Quinten's mouth.

The State next presented a report prepared by Robert M. Moriarty, a chemist from the University of Illinois at Chicago. Moriarty prepared numerous laboratory tests involving different concentrations of sulphuric acid combined with Similac. Moriarty's tests indicated that Quinten's injuries were not caused by a mixture of acid with Similac, but rather were caused by pouring directly pure sulphuric acid into Quinten's mouth. Moriarty's specific findings were:

"1. The sulphuric acid tainted Similac did not cause the injuries to the decedent infant.

2. The injuries are in agreement with concentrated sulphuric acid being administered directly to the decedent infant.

3. Sulphuric acid was added to the Similac independent of administration to the decedent infant.

4. Sulphuric acid was added to the baby bottle independent of administration to the decedent infant.

5. Insofar as the presence of iron is a signature for Similac, iron's absence on (codefendant's) pants and car seat (of codefendant) indicate that the sulphuric acid was placed there directly."

The State also presented a copy of a contract for legal services dated June 2, 1984, bearing the purported signature of Sheila M. Smith and an attorney at law.

Defendant then presented Edward J. Frischholz, a clinical psychologist, in mitigation. Dr. Frischholz testified that defendant underwent various psychological testing procedures. Dr. Frischholz interviewed defendant, defendant's family, defendant's attorneys, and a guard at the county jail. Dr. Frischholz reviewed various other reports, including police reports. Dr. Frischholz opined that defendant's intellectual functioning was in the borderline range, i.e., 71 to 84 IQ, which is significantly below average. According to Dr. Frischholz, defendant's social judgment is rather poor and defendant has poor abstract reasoning capacity. Dr. Frischholz also stated that defendant is unable to articulate the bases for her various assumptions. For example, defendant stated that she knew codefendant had tampered with Quinten's milk, but defendant could not articulate how she arrived at this assumption. Dr. Frischholz also concluded that defendant was legally sane.

Dr. Frischholz also stated that defendant was extremely dependent, a finding consistent with battered women's syndrome. Defendant blames others for her own mistakes and exhibits great denial. She also exhibits repression, wishing not to remember painful memories.

Dr. Frischholz also hypnotized defendant, a video film of which was played before the court. Based on the hypnotic session, Dr. Frischholz found that defendant suffered from amnesia. However, defendant's recollection of the events surrounding the injuries to Quinten grew stronger over time. Specifically, defendant eventually began feeling guilty because she knew about the couple's plan to sue the formula manufacturer and suspected Quinten's milk was contaminated, yet defendant did not take any steps to protect her baby. Dr. Frischholz stated that defendant's inability to remember completely these specific events was based on the following factors: (1) in battered women's syndrome, fear of the abuser (*i.e.*, codefendant) was constantly present; (2) defendant's strong psychological dependency on codefendant; and (3) defendant's previous knowledge of the couple's plan was that they would only hurt Quinten and "the obvious fact is that defendant's action did lead to killing the baby" and defendant "does not want to remember the fact that she played a part in this." Dr. Frischholz stated that to a reasonable degree of psychological certainty defendant was manifesting repression of the event, but, due to hypnosis, was beginning to remember more and more of her role. Dr. Frischholz stated defendant had a very good prognosis for recovering her memory completely through treatment. Dr. Frischholz stated that defendant would benefit from individual psychotherapy and needs to be educated regarding responding to outside factors, become more independent, and resist such an event ever happening again.

Lastly, defendant presented her younger brother, Samuel Smith, in mitigation. Samuel Smith testified he noticed bruises at various times on defendant from codefendant's attacks. Samuel Smith also had "words" with codefendant several times, attempting to set codefendant straight regarding his behavior towards defendant.

After respective counsel presented closing arguments, and defendant waived her right to allocution, the trial judge made the following comments:

> "Obviously it's been one of the most bizarre cases I have ever heard; both legally, evidentially and psychologically. I think Counsel is right. There are problems in this case which will never be answered. The crime of infanticide staggers the imagination. A crime committed with profit in view is beyond understanding, and I think there is evidence in this case that's still— that we have money in view. That Sheila on the 28th of May [*sic*] signing a contract for a lawyer to sue.
>
> I have—in the hospital notes there are references of her talking about the formula did it and she is going to sue. The minds

that conceive of this kind of crime are unspeakable. That the crime is heinous and indicative of wanton cruelty, and, therefore, an extended sentence is an understatement. I could reiterate all the adjectives used in *LaPoint* [*sic*] and those kind of cases describing what is heinous.

\* \* \*

I think if I started using the words cold and evil and the kind of words that are used in those kinds of cases, any adjectives would pale in light of the circumstances of this crime. I believe this defendant pled guilty to this offense because, in fact, she committed the offense. I think it undoubtedly was Irby's idea. I can find that her refusal now to admit the extent of her crime shows a lack of remorse. I don't think that's true. I think when we had the Irby trial and they wanted me to draw some inferences to the fact that she didn't testify, I think I was aware then that presumably it's impossible for someone to get on the stand and face hostile lawyers and a crowded courtroom and admit that they committed this crime.

I think it's really the inability to admit to her family, to her friends and indeed to herself that she committed these acts. I think she knowingly gave that child a liquid or toxic which she knew would cause him or was likely to cause him great bodily harm. I think that the psychological defense of denial and repression is there. I think that it's not abnormal to repress the fact that this kind of offense was committed. I think reality can be so painful that we deny reality just so that we can face it.

I think the reality in this case is that Sheila Smith took part in a plan which she knew or should have known would cause the death or great bodily harm to that child, and the child to whom she had a legal and moral obligation to protect and nurture. I am not unaware of the mitigating factors. She is young, lack of criminal history, she has a supportive family and friends, cares obviously for her other children. I am aware of the—I think it's Battered Spouse Syndrome that we more appropriately ought to be talking about. And I have seen that and I am aware of the effect that it has on her. I am aware of the compulsion from Ricky. I agree that I don't think that she contemplated the death of the child. I don't think she contemplated the scenario as it played out. And again I think its unlikely to occur again.

I don't know if the agreed term of 65 years that she pled to is an appropriate sentence or not. But I think the nature of this

crime and anything less than 60 years in the Department of Corrections would deprecate the seriousness of this offense and that's the sentence I would impose."

Defendant filed a motion to reconsider her sentence, contending that her 60-year sentence was excessive and not appropriate in light of her lack of criminal background, the circumstances regarding her involvement in the offense, and the fact that this was an isolated incident of abuse. Defendant contended further that the trial court failed to consider adequately the statutory mitigating factors. Defendant also contended that her participation in the offense was not indicative of wanton cruelty, that there was no evidence of ongoing abuse by defendant against either of her children, that this was clearly an isolated incident, and that defendant exhibited an unusual amount of remorse after the offense and throughout the court proceedings. Further, defendant contended the court did not properly consider her cooperation with the State as a step toward her rehabilitation. Moreover, defendant asserted that the length of the sentence did not reflect her rehabilitative potential or the goal of restoring her to useful citizenship.

At the hearing on defendant's motion to reconsider, the court stated:

"Well, at the sentencing hearing I believed I considered all the statutory factors in aggravation and mitigation and the presentence investigation and the evidence that I've heard, the arguments of counsel, the plea itself, and as I think that I indicated then, I believe that the crime was heinous, brutal, indicative of wanton cruelty. I do not think that there was any demonstration of any remorse during the long period of that young man's suffering in the hospital. I think that there was evidence that showed that they rarely visited the kid. They brought no presents. And, of course, this is quite after the fact. I read some time ago in one of the local papers that the child is now in a marked grave and that the marking was provided by the donations of some of the community other than that family. I think the sentence is appropriate and I would not reduce it."

Defendant then filed this appeal.

Defendant contends that her 60-year sentence is excessive and should be reduced. Specifically, defendant correctly asserts that article I, section 11, of the Illinois Constitution requires that all criminal penalties be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, §11). Furthermore, defendant points out that

in the statements of the purposes for the enactment of the Unified Code of Corrections (Code), the legislature stated in section 1—1—2:

"Purposes. The purposes of this Code of Corrections are to:

(a) prescribe sanctions proportionate to the seriousness of the offenses *and permit the recognition of differences in rehabilitation possibilities among individual offenders*;

(b) forbid and prevent the commission of offenses;

(c) prevent arbitrary or oppressive treatment of persons adjudicated offenders or delinquents; and

(d) *restore offenders to useful citizenship.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 1001—1—2.)

With these purposes in mind, defendant contends that the trial judge failed in his constitutional and statutory obligations to impose an appropriate and just sentence which fairly considered the need to punish defendant and the need to rehabilitate and restore defendant notwithstanding that defendant's sentence was less than the 65-year sentence cap provided for in the plea agreement.

We note initially that defendant pleaded guilty to murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)). During the plea negotiations and at the hearing on the plea agreement, the trial court advised defendant that if the court found that the crime was of a heinous or brutal nature, defendant could receive an extended-term sentence ranging from 40 to 80 years. After hearing all the evidence in aggravation and mitigation and the arguments of counsel, the trial court imposed an extended-term sentence of 60 years. Consequently, defendant's sentence was in the permissible statutory range as well as within the 65-year cap imposed by the State in the plea agreement.

■■ A trial court's sentencing decision is entitled to great deference and weight, and the standard of review is whether the trial court abused its discretion in imposing the sentence. (*People v. Streit* (1991), 142 Ill. 2d 13, 18-19; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) For a reviewing court to modify a sentence within the statutory limits, it must appear to the reviewing court that the sentence imposed is a clear departure from (1) the spirit and purpose of the fundamental law and (2) the constitutional requirement that the sentence be proportionate to the nature of the offense and that the possibilities for rehabilitation must be taken into account. (*People v. Bolden* (1991), 210 Ill. App. 3d 940, 947.) However, a defendant's rehabilitative potential is not entitled to more weight than is the seriousness of the offense involved. (*People v. Irby* (1992), 237 Ill. App. 3d 38, 71.) A sentence is presumptively correct, and only where such a presumption has been rebutted by an affirmative showing will a reviewing court

find that the trial court has abused its discretion. *People v. Plantinga* (1985), 132 Ill. App. 3d 512, 522.

Here, defendant submits that the trial judge did not consider adequately several applicable statutory mitigating factors which the judge was obligated to consider and weigh when imposing defendant's sentence. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1.

Defendant relies mainly on the mitigating factor found in section 5—5—3.1(a)(5) of the Code, that "the defendant's criminal conduct was induced or facilitated by someone other than the defendant." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(5).) Defendant contends that there is little doubt that but for defendant's association with codefendant, this crime would never have occurred and defendant would have continued to live a crime-free life. Defendant stresses that testimony at the sentencing hearing indicated that defendant's intellectuality level is at a range significantly below average. Dr. Frischholz testified that defendant was administered a number of standard mental/aptitude tests, and Dr. Frischholz believed that defendant fell within the borderline range of intellectual functioning. Dr. Frischholz further testified that among the characteristics of poor intellectual ability are poor social judgment, poor abstract reasoning capacity, and extreme dependency on others.

Defendant also relies on the Alfonso report, wherein it states that defendant had a difficult family history. The report stresses that as a teenager defendant met and fell under the influence of codefendant and continued with an on-again, off-again relationship resulting in continuous abuse by codefendant. Defendant also points to her brother Samuel Smith's testimony verifying codefendant's abusive behavior toward defendant. Moreover, defendant states that Dr. Frischholz' videotape of defendant's hypnotic session and his report regarding battered women's syndrome prove that defendant suffered from that abusive condition.

Additionally, defendant relies on the Alfonso report, wherein it found that as a result of "learned helplessness" battered women easily fall prey to their mates' coercion and intimidation, and they have no means of resisting demands that they do things against their will and interests. Defendant also relies on the documents in the presentence report prepared by Mary Stucko, a clinical psychology intern and Steven M. Julius, Ph.D., that stated defendant had a strong nurturing capacity and that prior to her involvement in this crime defendant showed *no abuse or neglect of her children.* Consequently, based on the tests of Dr. Frischholz and the reports of Alfonso, Stucko and Julius, defendant contends that her involvement in this

crime was obviously the influence of codefendant, who caused her to participate in this terrible crime against her child and against her own interest and that it was codefendant who "induced" and "facilitated" her complicity in the crime.

Next, defendant points to the mitigating factor that "the defendant's criminal conduct was the result of circumstances unlikely to recur" (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(8)). Similarly, defendant relies on the mitigating factor that "the character and attitudes of the defendant indicate that [she] is unlikely to commit another crime" (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(9)). Regarding these two mitigating factors, defendant asserts that "but for codefendant's conception of this tragic and bizarre scheme in order to obtain money from a product liability action, defendant would have had no role in injuring her child at all." Defendant asserts that there is no possibility that circumstances similar to this crime could recur in her lifetime. Defendant bases these contentions mainly on the assumption that defendant is now free of codefendant's influence because codefendant has been sentenced to 80 years' imprisonment. Moreover, defendant stresses that the record demonstrates that, absent codefendant's influence, defendant was a law-abiding citizen, a good mother, and a responsible parent. Defendant concludes by saying that there is no reason to believe she would not continue to be a law-abiding and useful citizen.

Defendant states that the trial court did not accurately consider the following mitigating factor, that "the defendant has no history of prior delinquency or criminal activity" (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(7)).

Defendant concludes her arguments by stating that the presence of all these mitigating factors was very significant in light of the Illinois constitutional mandate that the criminal sentencer has the obligation to impose a sentence consistent with the restoration of the individual to useful citizenship. Defendant contends that since her plea agreement provided that she would not be sentenced to death or natural life but to a maximum term of 65 years, the 60-year sentence imposed here had to reflect the eventuality that defendant would leave prison and be restored to free society. Defendant maintains that the existence of these above-mentioned mitigating factors demonstrates that defendant, now free of codefendant's presence and influence, does not require a 60-year period of incarceration in order to be restored to useful citizenship or to keep her from criminal conduct.

Lastly, defendant suggests that in view of the suffering caused to and the subsequent death of Quinten Irby, the trial judge weighed his

constitutional and statutory obligations of restoring the defendant to useful citizenship too lightly and that is why the judge imposed a 60-year sentence, 20 years more than the 40-year maximum nonextended term for the crime of murder. Consequently, defendant urges this court to reduce her sentence to a term of 40 years or to a term less than the 60 years imposed.

Conversely, the State contends that the trial judge did not abuse his discretion in imposing defendant's sentence. The State points out that defendant cannot point to any instance where the trial judge refused to consider an appropriate factor, or considered an improper factor in imposing defendant's sentence. The State contends that it is apparent from the judge's comments at sentencing that the judge gave deep and profound thought to his duties as sentencer and that he did not impose the sentence without due regard to those responsibilities. The State stresses that the trial judge specifically noted the possibility of battered women's syndrome and of compulsion from co-defendant, as well as the unlikelihood that the offense would recur.

Additionally, the State points out that the evidence contradicts defendant's characterization of her role of being a mere participant or "puppet" controlled by codefendant. The State points out that Dr. Oster and Dr. Gerson established that 15 to 30 cc's of fluid would be necessary to cause Quinten's injuries and that an infant would ingest 1 to 1½ cc's with each suck from a baby's bottle. Moreover, Dr. Oster stated that 15 to 30 sucks would be necessary to cause Quinten's extensive injuries and that a child of Quinten's age would not have taken a second suck from a bottle containing a substance caustic enough to do the damage caused to Quinten. Additionally, Drs. Gerson and Oster agreed that the acid could have been administered by force-feeding, with Dr. Oster opining that the caustic substance could have been poured directly from the bottle into Quinten's mouth or was administered with a teaspoon or a baster. Moreover, the State points out that Dr. Oster testified that the administration of the liquid required skill, because the burns inside Quinten's body were in the mouth area and the acid did not spill and cause burns elsewhere on Quinten body. The State maintains that such testimony establishes beyond a reasonable doubt that defendant picked up her three-month-old baby and forced him to ingest 15 to 30 cc's of sulphuric acid. The State stresses that the lack of additional spillage reflects not only skill, but the cold, unemotional self-control of someone not under the control of another. The State contends that to depict this act as a mere lapse in an otherwise blameless life is to denigrate the horror of the act and the agony suffered by Quinten Irby for more than two years afterward.

Additionally, the State points out that defendant's deliberation was shown by her behavior immediately after the offense. The defendant denied having fed Quinten on the morning of the incident, whereas the emergency room treating physicians testified that if the feeding had occurred the night before, as defendant had stated upon admission, Quinten would have died during the night. Consequently, the medical records and attending emergency physicians contradict the defendant's story and prove affirmatively that defendant poured the substance down Quinten's throat on the morning of the incident.

The State also stresses that the hospital notes reflect that defendant was aware of the civil lawsuit that the couple was planning to file as a result of Quinten's injuries. Specifically, the State points out the defendant's statements at the hospital that the company had 500 tainted bottles of formula and Quinten was the only one that got any.

The State points out that the Alfonso report, upon which defendant relies heavily, has inherent contradictions. Specifically, the State stresses that the Alfonso report indicates that defendant's family history fails to show that defendant grew up in a violent household. The only instance of violence during defendant's upbringing occurred when defendant's father found defendant's mother sitting on a chair with another man. No incidents of abuse to the children or of anyone else are reported in the Alfonso report. Consequently, the State argues, the Alfonso report's conclusion that the defendant grew up in a violent household is internally unreliable. Defendant also states that the Alfonso report's attempt to depict the defendant's mother as cold and uncaring is contradicted by the report of Mary Stucko and Steven M. Julius, which described defendant's mother's home as a "supportive, closely knit family environment."

Lastly, the State takes issue with defendant's portrayal as being a mere puppet under the control of codefendant by emphasizing that defendant and codefendant were not living together at the time of the offense and that codefendant was not present when the incident occurred.

■ After careful review of the evidence presented and respective counsel's arguments, we conclude that the trial court did not abuse its discretion in imposing defendant's 60-year extended-term sentence. A defendant's rehabilitative potential is not entitled to more weight than the seriousness of the offense. (*People v. Irby* (1992), 237 Ill. App. 3d 38, 71.) Here, there can be no doubt of the seriousness of the offense committed upon Quinten Irby. The evidence established that defendant deliberately poured a caustic substance down the throat of Quinten Irby causing extensive burns to his mouth, throat, esophagus,

lungs, and other organs. Moreover, Quinten had the use of only one lung throughout his life, and that with much difficulty. Hospital records and medical testimony establish that throughout his 27 months at Children's Memorial Hospital, Quinten was constantly in a precarious state, was close to death numerous times, suffered two respiratory attacks, and suffered throughout his entire stay. The trial judge took note of the seriousness of this offense, an offense committed by a natural mother against her baby, originating from the scheme to hurt her baby as part of a plan to file a civil lawsuit against a third party. Despite the defendant's young age of 27 years and potential for rehabilitation, the trial court was not required to weigh those factors over the seriousness of this offense. Defendant cites no persuasive authority to the contrary, nor do we find any cases on point that would warrant a reduction of defendant's sentence here.

Additionally, the judgment of a trial court in imposing sentence depends on many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age; the court is to consider all matters reflecting upon the defendant's personality, propensities, and tendencies—indeed every aspect of her life relevant to the sentencing proceeding. (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 268.) Here, the record reveals that defendant's credibility, demeanor, and general moral character indicate defendant's extreme lack of remorse for this crime. Although the hospital records establish that the defendant made many telephone calls to the hospital inquiring about Quinten's condition, defendant only visited Quinten approximately 20 times in the 27 months Quinten was hospitalized. Defendant's moral character also is reflected in defendant's cold and uncaring attitude displayed in the ambulance on the way to the hospital on the morning of the incident.

The trial court imposed an extended-term sentence based on the exceptionally brutal or heinous behavior indicative of wanton cruelty displayed by defendant in her role in this crime. "Brutal" is defined as grossly ruthless, devoid of mercy or compassion, and cruel or cold-blooded. (*People v. Benkowski* (1991), 215 Ill. App. 3d 615, 620.) "Heinous" is described as hatefully or shockingly evil, grossly bad, or enormously and flagrantly criminal. (*Benkowski*, 215 Ill. App. 3d at 620.) A trial court need only find a single required factor in aggravation to impose an extended-term sentence. (*Benkowski*, 215 Ill. App. 3d at 621.) The record reveals conclusively defendant's cruel, ruthless, evil, and flagrantly criminal behavior in causing her baby's death.

Moreover, the record shows that the trial judge, while concentrating on the brutal and heinous nature of the crime, did consider

defendant's potential for rehabilitation and the fact that she had lived a crime-free life prior to the incident. The judge also noted that defendant's repression and denial were real, that defendant was under some influence of the codefendant, and that defendant suffered from battered women's syndrome. We cannot conclude that the trial judge did not fairly consider these mitigating factors. The record reveals that the trial judge appropriately considered these factors as well as the brutal and heinous nature of the crime.

For the foregoing reasons, the order of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, P.J., and BOWMAN, J., concur.