THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BERTHA FLORES, Defendant-Appellant.

First District (4th Division)   No. 86—2435

Opinion filed March 17, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Jeffrey M. Howard, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Lynda A. Peters, Terese Griffin, and Loretta Diamonte, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a bench trial, defendant Bertha Flores was convicted of aggravated battery of a child (Ill. Rev. Stat. 1985, ch. 38, par. 12—4.3) and sentenced to four years' imprisonment. Defendant argues on appeal that: (1) her conviction must be reversed because the State failed to prove her guilty beyond a reasonable doubt and did not show that she was 18 years old or older, (2) she is entitled to a new trial because the preclusion of a material defense witness abridged her sixth amendment right to compulsory process or constituted an abuse of discretion, and (3) she is entitled to a new sentencing hearing because the trial court sentenced her based on improper considerations. We affirm.

BACKGROUND

On July 8, 1984, while defendant was bathing her six-week-old daughter, Cecelia Flores (Cecelia), the child was severely burned, on over 40% of her body, on her upper thighs, arms, chest, abdomen, sides, and back. She suffered life-threatening partial deep thickness burns (formerly referred to as second degree burns) over approximately 30% of her body.

Defendant testified that she put Cecelia in the kitchen sink to bathe her. She supported Cecelia with her left hand and bathed Cecelia with her right hand. There was one faucet in the sink and no plug, stopper, or anything to keep the water in the sink. The water flowed from the faucet into the sink and down the drain except for a "little bit" of water that accumulated in the drain.

Defendant's testimony indicated that Cecelia was held under the

faucet so the "stream hit in the chest" or the shoulder. The water was almost always hitting Cecelia. As defendant was shampooing Cecelia, about halfway through the bath, she heard a noise like air inside the faucet. The water pressure surged for almost a minute, then resumed normal flow. Defendant felt no change in the water's temperature. She explained she did not feel the water's temperature because while the water was hitting the baby's chest, her left hand was supporting the child from behind and her right hand was bathing the child. When she felt the water falling on the baby's chest, defendant stated it "didn't feel too hot [but] possibly for the baby it was too hot." Defendant testified that Cecelia was crying a little more than usual, but she always cried "violently" and moved her hands during her bath. The difference "wasn't too great." However, as defendant began to dry Cecelia, she noticed the skin on her daughter's arm "was pulling." Defendant called to Jose Flores (Jose), Cecelia's father, and told him Cecelia had been burned. Cecelia's skin was "inflating and blowing up" not only on her arm but on her chest. Jose took defendant and Cecelia to Columbus Hospital.

After the staff of Columbus Hospital gave Cecelia preliminary treatment, they transferred her to the burn unit at Wyler's Children's Hospital. Before transferring Cecelia, Dr. Sumidhra Kommareddy spoke with defendant for 30 to 45 minutes through an interpreter. Defendant stated to Dr. Kommareddy that she put Cecelia into a "bathtub [that] was full of hot water." Defendant claimed she did not know the water was too hot and that as soon as she realized it she immediately pulled Cecelia out of the water. Dr. Kommareddy concluded that defendant's account of Cecelia's bath was inconsistent with the distribution of Cecelia's burns. If Cecelia had been immersed in a bathtub of hot water, she would have burned not only her stomach and chest but her hands and legs as well.

Dr. Kommareddy admitted that she did not understand or speak Spanish and had to speak with defendant through an interpreter. According to defendant, the interpreter spoke a different type of Spanish than she spoke and translated haltingly, stopping often to think while interpreting. Defendant denied using the word "bathtub." She asserted that the interpreter misunderstood her statement about where she bathed Cecelia and translated it inaccurately.

At Wyler's Children's Hospital, Dr. Lawrence Gottlieb, co-director of Wyler's Burn Unit, supervised Cecelia's treatment. Dr. Gottlieb stated that Cecelia's injury was "consistent" with a scald burn. He explained that water heated to 150 degrees could inflict burns such as Cecelia's in one second, while water heated to 120 degrees would in-

flict such burns in one to two minutes. A hot bath would not have burned a child on the chest and stomach without also burning her legs, according to Dr. Gottlieb. Therefore, he concluded it was "impossible" for Cecelia's burns to have been caused by immersion in a hot bath. Dr. Gottlieb testified that Cecelia's burns were most likely the result of water falling onto her.

Although Cecelia's back was "clearly burned" on both sides, there was a patch of unburned skin on her back running diagonally from her upper right shoulder to her lower left back. Dr. Gottlieb thought that could indicate an arm holding the child. However, because there were burns above and below the unburned skin, he concluded that "without question" the arm would "have been burned or hot at least." While it is "plausible" that someone could have held Cecelia from behind as the water was scalding her and not receive any injuries, that person would have had to feel the change in temperature, according to Dr. Gottlieb. Also, there would have been "immediate crying and screaming and a lot of pain, and [the burn] would be noticed right away, or within a few minutes."

Wyler's Hospital released Cecelia to defendant after approximately two weeks of hospitalization. On the day following Cecelia's release from the hospital, defendant noticed that Cecelia would cry when her left arm was moved. Three days later, Jose took Cecelia to Wyler's Hospital for follow-up care. When he returned, defendant noticed that Cecelia's arm was swollen. She asked Jose if "they had done something to the arm at the hospital." Jose told her the hospital staff had examined the arm.

The next day, Natalia Salces, an investigator from the Department of Child and Family Services (DCFS), came to defendant's house. The investigator, a native Spanish speaker, questioned defendant, examined the sink and Cecelia, and concluded that the claim against defendant was unfounded.

Thereafter, defendant took Cecelia to the Flores' family physician, Dr. Carlos Gonzales. Defendant pointed out a swelling in Cecelia's arm. Dr. Gonzales reassured her that nothing was wrong with the arm. A few days later, however, when Dr. Gonzales noticed that the deformity was still present, he ordered an X ray of the arm.

The X rays were taken on August 6. According to Dr. Sharukin Yelda, an orthopedic surgeon on the staff of Swedish Covenant Hospital and Children's Memorial Hospital, the X rays revealed 13 fractures throughout Cecelia's body in different stages of healing. An X ray that had been taken at Wyler's Children's Hospital prior to Cecelia's release revealed that Cecelia also had fractures in her collarbone

and ribs. Absent a "very severe injury or accident or trauma," it would be very difficult for Cecelia to have broken these bones, Dr. Yelda stated. Dr. Yelda opined that her rib fractures "were sustained by being hit in the chest," and that the elbow, wrist, and ankle injuries were caused by "pulling severely, twisting or extending or bending." While Cecelia's three right ribs and her collarbone had been broken more than a month before the X rays, her elbow, wrist, ankle, and left ribs were fractured less than a week before the X rays. There was "no doubt in [Dr. Yelda's] mind that [Cecelia] is a victim of child abuse." Dr. Yelda testified that in his opinion, Cecelia will be unable to move her right elbow for the remainder of her life.

Defendant testified that she and Jose were the only persons to care for Cecelia except for two occasions, subsequent to the time the child was burned, when she left her with a baby-sitter. She could not explain the 13 fractures, although she stated that when Cecelia was 2½ weeks old, Cecelia's older sister had knocked Cecelia out of her crib onto the carpeted floor.

Defendant and Jose were charged by indictment for the offenses of cruelty to children, aggravated battery, and aggravated battery of a child. At the close of all the evidence, Jose was found not guilty, but defendant was convicted of aggravated battery of a child and sentenced to four years' imprisonment. Defendant appeals.

OPINION

I

■ Defendant contends that the State failed to prove her guilty beyond a reasonable doubt of aggravated battery of a child. Under the Illinois Criminal Code of 1961 "[a]ny person of the age 18 years and upwards who *intentionally* or *knowingly*, and without legal justification and by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years, commits the offense of aggravated battery of a child." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 12—4.3(a).

Defendant argues that the State failed to prove that she "intentionally or knowingly" harmed Cecelia. The knowledge and intent required to establish aggravated battery of a child involve an "awareness" by the accused of the harm which will result from the act. (*People v. Herr* (1980), 87 Ill. App. 3d 819, 822, 409 N.E.2d 442, 445, citing Ill. Rev. Stat. 1979, ch. 38, par. 4—5(b).) Ordinarily, this element of intent is established by circumstantial evidence. *People v. Traylor* (1985), 139 Ill. App. 3d 443, 447, 487 N.E.2d 1040; *People v*

*Smith* (1984), 124 Ill. App. 3d 243, 248, 464 N.E.2d 685.

■ We have reviewed the evidence and determine that it is sufficient to prove defendant guilty beyond a reasonable doubt of the offense of aggravated battery of a child. Defendant admits that she administered the bath that caused the burns and that the hot water may have surged for a minute during the bath. Although she claims she did not notice any increase in the temperature of the water, Dr. Gottlieb's testimony revealed that the water would have had to have been between 120 and 150 degrees to cause such burns in one minute. Thus, while someone could have been holding Cecelia, Dr. Gottlieb concluded the person would have "at least" felt the change in temperature. Also, there would have been "immediate crying and screaming and a lot of pain." We find there is ample evidence from which the trier of fact could have concluded that defendant was aware that the water was hot enough to harm Cecelia.

With regard to the fractures, Dr. Yelda explained that the elbow, wrist, and ankle fractures resulted from severe twisting, extending, or bending and that the broken ribs were caused by a blow to the chest or pressure to the chest. Dr. Yelda testified that Cecelia's elbow injuries will leave her permanently deformed and disabled. He stated that it is very unusual for a child Cecelia's age to sustain fractures absent a "very severe injury or accident or trauma" and, based on his experience, he has "no doubt" that Cecelia was the victim of child abuse. Defendant testified that Cecelia was under her care and supervision except for two instances where a baby-sitter cared for Cecelia.

Based upon defendant's admission that she held Cecelia during the time that running hot water caused the child's burns, the medical testimony regarding the manner in which those burns were inflicted, and the testimony relating to when and how the multiple fractures were sustained, we determine that the evidence sufficiently established beyond a reasonable doubt that defendant knowingly caused great bodily harm. We have carefully reviewed defendant's allegations of error respecting her intentional infliction of harm to the child and the standard of proof articulated by the court. We conclude that the trial is sufficiently free of error and find that the record supports defendant's conviction of aggravated battery of a child.

■ Defendant also contends that the State failed to prove that she was 18 years of age or older. A conviction for aggravated battery of a child requires the accused be over 18 years of age at the time of the act. (See Ill. Rev. Stat. 1985, ch. 38, par. 12—4.3(a).) However, an adult's "exact age" need not be proved unless the evidence tends to show defendant was under the requisite age. (*People v. Cavaness*

(1960), 21 Ill. 2d 46, 52, 171 N.E.2d 56, 59; *People v. Stolfo* (1961), 32 Ill. App. 2d 340, 177 N.E.2d 881; see also *People v. Dalton* (1982), 91 Ill. 2d 22, 28, 434 N.E.2d 1127; *People v. D'Angelo* (1975), 30 Ill. App. 3d 86, 90-91, 333 N.E.2d 525, *appeal denied* (1975), 61 Ill. 2d 598.) The observation of the trier of fact may corroborate evidence of defendant's age. See *People v. Dalton* (1982), 91 Ill. 2d 22, 29, 434 N.E.2d 1127.

For example, this court in *Stolfo* held that the State need not prove that a defendant was 17 years of age, since the evidence showed that the defendant was married, had two children, had worked for over four years, and there was no evidence tending to show that the defendant was under the requisite age. Here, defendant testified that she had been married for five years and employed for four years. She was the mother of both a four-year-old child and a two-year-old child. We find this evidence sufficiently probative of defendant's age to support her conviction.

## II

■ Defendant argues that she is entitled to a new trial because the trial court excluded the testimony of a material defense witness, Dr. Bertram Levin, as a sanction for defendant's infractions of discovery rules. Defendant contends that the court's exclusion violated the compulsory process clause of the sixth amendment and was an abuse of discretion. (U.S. Const., amend. VI.) The State argues that the refusal to accept the testimony of Dr. Levin was an appropriate sanction, based on the late notice of defendant's intention to present the testimony of not only Dr. Levin, but also Dr. Rudich, defendant's initial medical witness.

When defendant informed the court that she wished to call Dr. Perry Rudich to testify, the State objected because defendant had not at that time filed an answer to the State's discovery request in which the witness' identification would have been disclosed. At the time defendant requested to call Dr. Rudich, the State had already introduced the testimony of all three of its medical expert witnesses. The trial court ruled that it would allow Dr. Rudich to testify and ordered defendant to file an answer to the State's discovery request. The court indicated that the State would be permitted whatever continuance it deemed necessary because of the court's allowance of the testimony of Dr. Rudich.

Dr. Rudich had originally concluded that there were no fractures in Cecelia's arms. However, a week prior to the date on which he was scheduled to testify, he informed defendant that he had reviewed the

X rays and that based on this review he would conclude there had been fractures. Within one week after Dr. Rudich so informed defendant, she located another witness, Dr. Bertram Levin, to testify in her favor regarding the fractures. She notified the State and the trial court of her wish to have Dr. Levin testify on the day after she had located him; she made an offer of proof and indicated that the witness would be available for questioning by the State before the witness was presented.

In her offer of proof, defendant stated that if permitted to testify, Dr. Levin would state that he is a physician on the attending staff and director of the department of diagnostic radiology at Michael Reese Hospital, a professor of radiology at the Pritzker School of Medicine at the University of Chicago, and an expert in pediatric radiology. On the basis of Cecelia's X rays, Dr. Levin would conclude that the fractures shown are consistent with the injuries of children who were injured by a fall from the bed or crib or who were accidentally dropped during hospitalization or in the course of play or normal care. Dr. Levin was of the opinion that it is impossible to determine from the X rays whether the injuries resulted from one instance of trauma or several, and he disputed Dr. Yelda's absolute certainty in dating Cecelia's fractures and predicting her disability.

The United States Supreme Court recently addressed the issue of exclusion as a sanction for discovery violations in *Taylor v. Illinois* (1988), 484 U.S. ___, 98 L. Ed. 2d 798, 108 S. Ct. 646. Premised on the concept that the right of an accused to present witnesses in his own defense is a most fundamental right, the *Taylor* court recognized that government must assist criminal defendants in their efforts to compel the attendance of favorable witnesses at trial.

The same principle that guarantees the accused the right to present witnesses also supports the "imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." (484 U.S. at ___, 98 L. Ed. 2d at 811-12, 108 S. Ct. at 653.) Discovery "minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony." (484 U.S. at ___, 98 L. Ed. 2d at 812, 108 S. Ct. at 654.) Consequently, the court rejected the argument that preclusion is never a permissible sanction for a discovery violation.

The *Taylor* court held that if the accused's explanation for his failure to comply with a request for pretrial identification of witnesses "reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would

be entirely consistent with the purposes of the Confrontation Clause simply to exclude the witness' testimony. [Citation.]." 484 U.S. at ____, 98 L. Ed. 2d at 814, 108 S. Ct. at 655-56.

■ Illinois Supreme Court Rule 415 provides when a party discovers new material subject to disclosure after complying with discovery, the party "shall promptly notify" the other party and the court, if the material is discovered during trial. (107 Ill. 2d R. 415.) An unintentional omission has been held not to violate discovery rules where the prosecutor and the trial court are notified "immediately" after the party "became aware of this witness" and "as soon as the intent to call the witness was formed." *People v. Rayford* (1976), 43 Ill. App. 3d 283, 287, 356 N.E.2d 1274, 1277.

■ ■ Generally the decision regarding whether a sanction is appropriate for a discovery violation rests within the discretion of the trial court, and the exercise of that discretion will not be disturbed absent a showing of prejudice. (*People v. LaFiura* (1981), 93 Ill. App. 3d 1099, 1103-04, 418 N.E.2d 48.) However, recess and continuance are to be thoughtfully considered and preferred to exclusion as a sanction. (See *People v. Loggins* (1985), 134 Ill. App. 3d 684, 691, 480 N.E.2d 1293, *appeal denied* (1985), 108 Ill. 2d 581; *People v. Winfield* (1983), 113 Ill. App. 3d 818, 837, 447 N.E.2d 1029.) We have held the imposition of exclusion to be an abuse of discretion where the State had "ample opportunity" to interview the additional witness. (*People v. Foster* (1986), 145 Ill. App. 3d 477, 479-81, 495 N.E.2d 1141, 1143.) In *Taylor*, the United States Supreme Court noted that "in Illinois, the sanction of preclusion is reserved for only the most extreme cases" " 'where the uncooperative party demonstrates a "deliberate contumacious or unwarranted disregard for the trial court's authority." [Citation.]' " 484 U.S. at ____ n.23, 98 L. Ed. 2d at 816 n.23, 108 S. Ct. at 657 n.23, quoting *People v. Rayford* (1976), 43 Ill. App. 3d 283, 286, 356 N.E.2d 1274, 1277.

In this case, while it is not altogether clear that defendant violated discovery rules with regard to Dr. Levin, we agree that some sanction was appropriate in light of defendant's tardiness. However, the trial court should not have excluded Dr. Levin's testimony. Even assuming defendant's previous discovery violations, we cannot agree that those violations were deliberate, contumacious, or demonstrated unwarranted disregard for the trial court's authority so as to merit the exclusion of a material witness. Nor was it clear that defendant was seeking to reap a tactical advantage from the State's surprise. The witness was available for interrogation by the State prior to his testifying. There is no indication in the record that, based upon the

offer of proof, the State would be handicapped in any effort to rebut the testimony of Dr. Levin.

■■ However, defendant failed to demonstrate prejudice in the exclusion of Dr. Levin's testimony. This was a bench trial. The trial court remarked that even "accepting *per se* all the proof that [defendant] indicated," the finding of the court would remain the same. In the circumstances of this case, the trial court's exclusion of Dr. Levin's testimony does not constitute reversible error. Defendant's offer of proof indicates that Dr. Levin's testimony would relate only to the fractures. Dr. Gottlieb's testimony establishing that defendant must have known she was burning or seriously harming her daughter would remain uncontroverted. Consequently even if Dr. Levin's testimony were preferred by the court, there was sufficient evidence to convict defendant.

### III

■■ Finally, defendant asserts that the trial court abused its discretion in sentencing her to four years' imprisonment. Defendant argues that the sentence was based on her responsibility for Jose's acts. We disagree. Although the court commented during the sentencing hearing that Jose might have had some role in the fractures, he also expressed the opinion that defendant should stand up to her husband if he abuses Cecelia. A court of review will not upset the trial court's imposition of a sentence of imprisonment absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Conviction for aggravated battery of a child is subject to a sentence of three to seven years' imprisonment. (See Ill. Rev. Stat. 1985, ch. 38, pars. 12—4.3, 1005—8—1(a)(5).) Based on our review of the record, we do not find that the trial court abused its discretion in sentencing defendant to four years' imprisonment.

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.