THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN RODRIGUEZ, Defendant-Appellant.

First District (5th Division)    No. 1—92—1809

Opinion filed September 1, 1995.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Sang Won Shim, and William P. Farrell, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

## BACKGROUND

On January 16, 1992, a jury convicted defendant-appellant Juan Rodriguez of first degree murder in the June 3, 1990, killing of three-year-old Marion Knee. The circuit court entered judgment on that verdict and subsequently sentenced the defendant to an 80-year extended term of imprisonment. For the reasons set forth below, we affirm the defendant's conviction but remand for resentencing.

## FACTS

The defendant's trial commenced on January 10, 1992, and the State's first witness, the victim's mother, Rhonda Knee (hereinafter referred to as Rhonda), testified that in June of 1990 she lived at 9818 S. Ewing in Chicago with the victim, her sons Gregory and William, and the defendant. At the time of the killing, Gregory Knee was four years old and William Knee was two. The defendant had resided with Rhonda and her children since June of 1989.

Rhonda testified that the defendant originally had treated her children well but that his treatment of the victim changed in May of 1990, at which time he began to punish her more frequently. The punishments included making the victim stand in a corner with her arms restrained by zipping them inside her pajamas, poking her in the stomach, and, on one occasion, putting a pair of socks in her mouth. Rhonda stated that the defendant's poking sometimes bruised the victim's stomach.

Rhonda further testified that the victim had sustained a broken arm in early May of 1990. She was absent when that injury occurred but the defendant, who had been watching the victim at the time, told her that the victim broke her arm jumping from one bed to another. Rhonda observed burn marks on the backs of both of the victim's hands in May of 1990, stating that the victim received those burns "messing with the coffee pot." She also stated that approximately one week before the victim's death she observed a bruise on the victim's ear lobe which prompted her to say to the defendant, "If I see *** any more [bruises you are] out."

Rhonda continued that on the morning of June 3, 1990, the defendant woke her: "[h]e was screaming that the [victim] was sick and he was carrying her in my room." She noticed that the victim "was real pale" and "looked sick." After the police and paramedics had arrived, and the victim had been taken to a hospital, the defendant told her that "[h]e didn't mean to hurt her."

On cross-examination, Rhonda stated that the victim bruised eas-

ily, that the victim giggled when the defendant poked her in the stomach, and that the pair of socks which the defendant put in the victim's mouth were baby socks and that he took them "right out" when he saw that they were "troubling her." She also indicated that her brother and sister-in-law also may have been abusing the victim.

Dr. Michael Chambliss testified for the State that on June 4, 1990, he worked as an assistant Cook County medical examiner and performed an autopsy of the victim's body. He noted that the victim was approximately three feet tall and weighed 30 pounds. In his external examination, he observed multiple bruises on both sides of the victim's lower abdomen, which was noticeably distended, and a slightly curved abrasion of the right side of the abdominal wall to the side of the navel. He also observed multiple bruises on her face and ears, lower and mid back, left buttock, and on her arms and legs. With respect to the injuries on the victim's ears, Dr. Chambliss stated that "[t]here's more bruising on both ears of this child than I have seen before." He noted a fracture of the victim's left arm, which bore a cast at the time of her death, just above the elbow.

In his internal examination, Dr. Chambliss observed a large amount of blood throughout the abdominal cavity (approximately one half of the victim's total blood volume) which caused the distention. "The blood that was collected there was associated with 3 lacerations of the blood supply to the intestines we call the mesentery." He also observed bruising to the victim's intestines. Dr. Chambliss stated that the mesentery was injured by being driven against the spine, an injury requiring "significant force." He also pointed out that all of the bruises on the abdomen were the result of a recent injury and could not have resulted from a mere accident.

Dr. Chambliss opined that "the death of [the victim] was secondary to lacerations of the mesentery, as a result of blunt trauma." He stated that the severe bleeding resulting from the injuries to the mesentery would have produced shock, and then death, "within a matter of minutes." Dr. Chambliss further opined that the location and nature of the injuries to the mesentery would have required more than one blow to cause them.

In his internal examination of the victim's skull, Dr. Chambliss observed multiple areas of bleeding in the soft tissue over its top. He attributed that bleeding to blunt trauma. Over the defendant's objection, the circuit court allowed into evidence a chart which Dr. Chambliss prepared, detailing the location of those injuries. The court also permitted the jury to take that chart into the jury room during its deliberations.

Dr. Chambliss described the fracture he observed in the victim's

left arm as a "spiral fracture" which, in children, would require "very significant force." He opined that a fall from a bed would not plausibly account for a spiral fracture and that such a fracture would more likely result from twisting, "consistent with someone twisting [the victim's] arm at the elbow area." On cross-examination, Dr. Chambliss stated that the injuries to the victim's mesentery would have required at least two blows and, based on the type of injuries he observed in performing the autopsy, he "would consider [the victim] to be an abused child."

Officer James Banks of the Chicago police also testified for the State. He arrived at 9818 S. Ewing on the morning of June 3, 1990, as paramedics were removing the victim from the premises. Banks spoke to the defendant, who told him that he had sent the victim to stand in a closet as punishment for "mess[ing] in her pants." After 20 to 30 minutes passed, the defendant "heard a thump" and found the victim lying on the floor.

Detective George Winistorfer of the Chicago police testified that he also arrived at 9818 S. Ewing on that fatal morning. He interviewed the defendant, who gave the same account of the occurrence that he had earlier given to Officer Banks. The defendant and Rhonda were eventually transported to Area Two Detective Division Headquarters, where Winistorfer reinterviewed the defendant, who repeated the statement which he had already given twice before. Detective Winistorfer then testified, over the defendant's hearsay objection and without a limiting instruction, that he then informed the defendant that the victim's brother Gregory told him "that he had observed that morning [the defendant] hitting the victim *** and also banging her head on the floor."

Detective Winistorfer continued that, upon being confronted with Gregory's purported statement, the defendant confessed that he woke up with a hangover and, when he noticed that the victim had defecated in her pants, he

> "swatted her on the arm or on the butt, and he got feces on his hand and up his arm. He then got mad and hit her on the arm and she started crying. He said that she wouldn't stop crying. And that is when he took his, the palm of his hand, and hit her twice in the abdomen."

The next day, June 4, 1990, Winistorfer again interviewed the defendant, who made substantially the same confession as he had made the preceding day. During that interview, Winistorfer asked the defendant to demonstrate the manner in which he struck the victim on the morning of June 3, 1990. In response, the defendant struck a wall twice with the palm of his open hand. Detective Winistorfer described

that demonstration as "two forceful blows that reverberated in the room and on the wall." On cross-examination, Winistorfer stated that Rhonda had told him that the defendant had injured the victim prior to the date of the killing by bruising her body, presumably by striking her.

Assistant State's Attorney Kevin Sheehan testified that the defendant orally related to him essentially the same confession as he had given earlier. According to Sheehan, the defendant said that he became angry at the victim when she soiled his hand, that he then hit her in the stomach twice, and that upon being struck the victim "gasped, could not catch her breath, her eyes rolled back in her head and that she then collapsed on the floor." John Wyatt, who worked as an assistant State's Attorney in June of 1990, testified that he elicited a signed, handwritten confession from the defendant which recited the same facts as contained in his oral confessions.

The defendant testified on his own behalf. He stated that from the beginning of his relationship with Rhonda he noticed that her children "were often you know they were being neglected, being abused." He stated that "[Rhonda] was hitting the children. [The victim] in particular." He further testified he was "sure" that Rhonda's brother and sister-in-law had physically abused the victim. The defendant acknowledged that he had previously restrained the victim's hands by zipping them inside her pajamas and that, on one occasion, he put a pair of socks in her mouth because "she was throwing a fit."

With respect to the events of the morning of June 3, 1990, the defendant stated that Rhonda carried the victim into their bedroom and woke him, stating that the victim was quite ill. After the defendant found no pulse or respiration, he attempted cardio-pulmonary resuscitation of the victim while Rhonda summoned assistance. According to the defendant, when the police and paramedics had arrived Rhonda admitted to him that she kicked the victim in anger because she had soiled her hand on the victim's underpants after the victim had a toilet training accident.

The defendant said that he advised Rhonda that she was in "deep trouble" and then took the blame on himself by falsely telling Detective Winistorfer and both assistant State's Attorneys that he was responsible for acts which Rhonda actually committed. He stated that he did so to shield Rhonda because he believed her to be pregnant with his child.

On cross-examination, the State asked the defendant whether

Rhonda ever told him to which part of the body, or how many times, she allegedly kicked the victim. He replied that "[o]nly thing Rhonda told me was that she kicked her. And that is it." The defendant acknowledged that his poking of the victim had left bruises.

The circuit court instructed the jury on first degree murder and involuntary manslaughter. The court also gave Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (2d ed. Supp. 1989) (IPI Criminal 2d) in its entirety. On January 16, 1992, the jury returned a verdict of guilty of first degree murder and the circuit court entered judgment on that verdict. On February 13, 1992, the court denied the defendant's post-trial motions. On March 5, 1992, the court denied his motion for reconsideration and found him eligible for the death penalty.

On April 14, 1992, the court declined to impose the death penalty but instead sentenced him to an extended 80-year term of imprisonment pursuant to section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2)) because the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The defendant had no prior convictions.

On appeal, the defendant raises the following contentions: (1) that the circuit court improperly allowed Detective Winistorfer to testify to what the victim's brother Gregory allegedly told him regarding what he had seen the defendant do to the victim on the morning of the killing and further erred by failing to give a limiting instruction; (2) that the court erred in denying his motion *in limine* to limit the evidence of the victim's injuries which were not directly related to her death; (3) that the court erred in giving the jury the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989);[1] (4) that his trial counsel provided ineffective assistance by failing to preserve contentions one through three for appellate review;[2] and (5) that the circuit court abused its discretion in sentencing him to an extended term of 80 years' imprisonment.

---

[1] The defendant raises this issue in a *pro se* supplemental brief filed over the State's objection on April 2, 1994.

[2] Because of the page limitation imposed by Supreme Court Rule 23 (166 Ill. 2d R. 23), the discussion of the issues raised by this fourth contention has been deleted for purposes of publication but may be found in the unabridged decision contained in the opinion filed with the clerk of this court in the cause of *People v. Rodriguez*, docket No. 1—92—1809.

OPINION

HEARSAY STATEMENT

The defendant first argues that the circuit court committed reversible error by allowing Detective Winistorfer to testify that Gregory had told him that on the morning of the killing he observed the defendant "hitting the victim *** and also banging her head on the floor." He further avers that the court erred in allowing into evidence Dr. Chambliss' chart which detailed the victim's head injuries because the court predicated the admission of that document on Gregory's hearsay statement as related by Detective Winistorfer.

The State responds that Detective Winistorfer's testimony regarding what Gregory had told him was not offered to prove that the defendant struck the victim's head on the floor but rather to show that the statement itself prompted him to confess and therefore was properly admitted as a circumstance surrounding his confession. The State further maintains that even if it was error to admit Detective Winistorfer's testimony regarding Gregory's statement, any such error was waived and in any event was harmless given the overwhelming evidence of the defendant's guilt.

The defendant concedes that he has waived appellate review of these alleged errors by failing to include them in a post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 185-90, 522 N.E.2d 1124, 1129-31; *People v. Alcazar* (1988), 173 Ill. App. 3d 344, 354, 527 N.E.2d 325, 331.) However, he urges that we may yet review them under the plain error doctrine. See 134 Ill. 2d R. 615(a).

"The plain error doctrine provides that a court of review may notice waived errors if either the evidence is closely balanced or the error is fundamental and of such magnitude that the accused was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process." (*People v. Gonzalez* (1992), 238 Ill. App. 3d 303, 314, 606 N.E.2d 304, 312; accord *People v. Shields* (1991), 143 Ill. 2d 435, 446, 575 N.E.2d 538, 543; *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10, 561 N.E.2d 1, 7-8.) The defendant argues that we should apply the plain error doctrine because the evidence in this case is closely balanced on both the issue of whether he in fact performed the killing acts and, if it were found that he performed those acts, on the issue of whether he did so intentionally, knowingly, or recklessly.

However, "[b]efore plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231;

accord *People v. Blackwell* (1995), 164 Ill. 2d 67, 79, 646 N.E.2d 610, 616 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.); *People v. Lann* (1994), 261 Ill. App. 3d 456, 477-78, 633 N.E.2d 938, 953 (DiVito, J., concurring in part and dissenting in part).) Thus, we shall first consider whether the circuit court erred by allowing Detective Winistorfer's testimony relating to what Gregory Knee had told him.

Initially, we agree that the circuit court erred in allowing Detective Winistorfer to recite the substance of Gregory's hearsay statement. The court in *People v. Trotter* (1993), 254 Ill. App. 3d 514, 626 N.E.2d 1104, stated:

> "Although a police officer may reconstruct the steps taken in a crime's investigation and may describe the events leading up to the defendant's arrest where such testimony is necessary and important to fully explain the State's case to the jury (*People v. Simms* (1991), 143 Ill. 2d 154, 174, 572 N.E.2d 947), there is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation. (*People v. Johnson* (1990), 202 Ill. App. 3d 417, 421, 559 N.E.2d 1041.) Under the investigatory procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents. (*People v. Mitran* (1990), 194 Ill. App. 3d 344, 350, 550 N.E.2d 1258.) The police officer should not testify to the contents of the conversation (*People v. Henderson* (1990), 142 Ill. 2d 258, 303, 568 N.E.2d 1234), since such testimony is inadmissible hearsay. *People v. Gacho* (1988), 122 Ill. 2d 221, 248, 522 N.E.2d 1146.
>
> If such testimony is presented, however, the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that they were not to accept the statement as true. (*Simms*, 143 Ill. 2d at 174.) No such instruction was given in this trial. Thus, it cannot be presumed that the jury's use of the evidence was limited to nonhearsay purposes." 254 Ill. App. 3d at 527-28, 626 N.E.2d at 1112-13.

Accord *People v. Furby* (1992), 228 Ill. App. 3d 1, 8-10, 591 N.E.2d 533, 539-40; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.5, at 648-49 (6th ed. 1994).

The fact that Detective Winistorfer had a conversation with Gregory Knee would have been admissible as an event leading up to the defendant's confession and subsequent arrest. The substance of that

conversation, however, was rank hearsay. (See *People v. Trotter*, 254 Ill. App. 3d 514, 626 N.E.2d 1104; *People v. Furby*, 228 Ill. App. 3d 1, 591 N.E.2d 533.) The admission of the substance of Gregory's statement in effect provided the State with the testimony of an uncross-examined eyewitness that the defendant did in fact beat the victim on the morning of her death.

Most significantly, the impact of this error was exacerbated by the failure to give the jury an instruction limiting the purposes for which it could use that statement. Absent such an instruction, and regardless of the purpose for which the State offered it, nothing prevented the jury from using that statement as substantive evidence. See *People v. Trotter*, 254 Ill. App. 3d 514, 626 N.E.2d 1104; *People v. Furby*, 228 Ill. App. 3d 1, 591 N.E.2d 533; see also E. Cleary, McCormick on Evidence § 248, at 587 (2d ed. 1972) ("if [a police officer] becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay").

■ However, even assuming that this error in admitting Gregory's hearsay statement were properly preserved, any such error would have been harmless given the overwhelming evidence of the defendant's guilt of first degree murder. A trial error will be deemed harmless where the evidence supporting the defendant's conviction is so overwhelming that the defendant would have been convicted even if the error had not occurred. *People v. Laliberte* (1993), 246 Ill. App. 3d 159, 173, 615 N.E.2d 813, 823; *People v. Moreno* (1992), 238 Ill. App. 3d 626, 637, 606 N.E.2d 514, 522.

The evidence that the defendant performed the killing acts was overwhelming. He confessed on three different occasions to three different persons that he administered the fatal blows. (See *People v. Smith* (1963), 27 Ill. 2d 344, 349, 189 N.E.2d 257, 260 ("a voluntary confession by a competent person is the highest type of evidence known to the law"); see also *People v. Mullen* (1990), 141 Ill. 2d 394, 409, 566 N.E.2d 222, 230 (Miller, J., dissenting) (same).) We note that notwithstanding his trial testimony that he falsely confessed to protect Rhonda, his confessions contained specific factual information relating to the area of the victim's body which was struck, and to the number of blows, which corresponded precisely with Dr. Chambliss' observations. According to his own testimony, the defendant could not have obtained this information from Rhonda because she told him neither which area of the victim's body she kicked nor the number of blows.

Moreover, the evidence that the defendant possessed the requisite

mental state for first degree murder rather than involuntary manslaughter also was overwhelming.

First degree murder requires an intent to kill or knowledge that death or great bodily harm will result. Involuntary manslaughter is committed when an actor consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm but otherwise lacks intent to kill or knowledge that his acts are likely to cause death or great bodily harm.

With respect to whether a defendant intends to kill or knows that his actions are likely to cause death or great bodily harm, an accused's intent or knowledge can be reasonably inferred from, and is often proved by, the circumstances surrounding the incident, including the nature and severity of the victim's injuries. See, *e.g.*, *People v. West* (1990), 137 Ill. 2d 558, 585-86, 560 N.E.2d 594, 606-07; *People v. Renteria* (1992), 232 Ill. App. 3d 409, 416-17, 597 N.E.2d 714, 719; *People v. Flores* (1988), 168 Ill. App. 3d 284, 289-90, 522 N.E.2d 708, 711.

When a defendant uses a deadly weapon upon a victim, a strong inference arises that he intended to cause the victim's death. (See *People v. Salazar* (1988), 126 Ill. 2d 424, 449, 535 N.E.2d 766, 776.) Such an inference also arises when a defendant strikes a blow with a bare hand when a great disparity in size and strength exists between him and the victim even though a bare hand is not ordinarily regarded as a deadly weapon. See *People v. Brackett* (1987), 117 Ill. 2d 170, 179-80, 510 N.E.2d 877, 882 (170-pound male who beat an 85-year-old woman created a strong probability of death or great bodily harm); *People v. Ward* (1984), 101 Ill. 2d 443, 452, 463 N.E.2d 696, 700 (adult male who beat a four-year-old child with fists and a mop handle was not acting merely recklessly).

Moreover, death from a single blow, as distinguished from a continuous beating, has been held to be sufficient to support a conviction for murder rather than involuntary manslaughter. See *People v. Summers* (1990), 202 Ill. App. 3d 1, 9-11, 559 N.E.2d 1133, 1138-39 (single blow to the head of a 19-month-old sufficient to support a conviction for first degree murder); *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 421, 304 N.E.2d 455, 457-58 (single blow to a 14-month-old's stomach sufficient to support a murder conviction).

Evidence of a defendant's prior acts of violence toward a victim also tends to prove a defendant's mental state (*e.g.*, the presence of intent) at the time of the commission of the charged offense. See *People v. West*, 137 Ill. 2d at 586, 560 N.E.2d at 607; *People v. McCarthy* (1989), 132 Ill. 2d 331, 344, 547 N.E.2d 459, 464; *People v. Lucas* (1989), 132 Ill. 2d 399, 429, 548 N.E.2d 1003, 1015.

Although Gregory Knee's improperly admitted hearsay statement would have bolstered the conclusion that the defendant did not act recklessly, the admissible evidence in this case overwhelmingly proved that the defendant possessed the requisite mental state for first degree murder at the time of the killing. A great disparity in size and strength obviously existed between the three-year-old, three-foot-tall, 30-pound victim and the defendant, who admitted to striking two blows to her abdomen. (See *People v. Brackett*, 117 Ill. 2d 170, 510 N.E.2d 877; *People v. Ward*, 101 Ill. 2d 443, 463 N.E.2d 696.) Dr. Chambliss testified that "significant force" would have been necessary to produce the injuries to the mesentery which resulted in the victim's death, and Detective Winistorfer described the defendant's demonstration of the manner in which he struck her as delivering "two forceful blows" with the palm of his open hand which "reverberated in the room and on the wall." See *People v. West*, 137 Ill. 2d 588, 560 N.E.2d 594; *People v. Renteria*, 232 Ill. App. 3d 409, 597 N.E.2d 714; *People v. Flores*, 168 Ill. App. 3d 284, 522 N.E.2d 708.

■ This evidence showing the great disparity in size between the victim and the defendant and the vital part of the victim's body to which the fatal blows were struck, and the testimony suggesting that they were in fact forceful, together create a strong inference that the defendant either knew that his acts created a substantial probability of, or that he intended to cause, death or great bodily harm. Moreover, the fact that the defendant admittedly struck the victim out of anger (presumably because she had defecated in her pants and he had soiled his hand) further negates a finding of recklessness because "[a] person who is driven by his bad temper to injure or kill another acts knowingly or intentionally, not recklessly." *People v. Summers*, 202 Ill. App. 3d at 11, 559 N.E.2d at 1139.

In addition, the evidence of prior abuse further reinforced the conclusion that the defendant did not act recklessly. (See *People v. West*, 137 Ill. 2d 588, 560 N.E.2d 594; *People v. McCarthy*, 132 Ill. 2d 331, 547 N.E.2d 459; *People v. Lucas*, 132 Ill. 2d 399, 548 N.E.2d 1003.) This included evidence of a broken arm which, according to Rhonda's testimony, occurred when the victim was exclusively in the defendant's care. The defendant did not deny that the fracture occurred under his care but attempted to attribute it to a fall. Doctor Chambliss repudiated that explanation, stating that the fracture was spiral, consistent with hard twisting. Rhonda also testified, and the defendant acknowledged, that he would on occasions poke the victim in the abdomen hard enough to cause bruising and that on one occasion he put a pair of socks in her mouth. We note that at oral argument the defendant's counsel in fact conceded that sufficient evi-

dence was adduced at trial to prove "beyond a preponderance" that the defendant was responsible for at least some of the prior abuse.

We further note that for the purpose of our analysis here we need not determine whether the evidence of more extensive prior abuse was also attributable to the defendant. Moreover, even without any evidence of prior abuse, the other evidence in this case is sufficient to overwhelmingly establish that the defendant possessed the requisite mental state for first degree murder at the time of the killing.

Thus, since the error in permitting Gregory's hearsay statement to come in through Detective Winistorfer was harmless, we must likewise conclude that the plain error doctrine cannot be invoked. See *People v. Zeisler* (1988), 125 Ill. 2d 42, 48, 531 N.E.2d 24, 27 ("Under the doctrine of plain error, a reviewing court is permitted to address an issue which has been waived where the evidence is closely balanced or where the error is of such a magnitude that the accused was denied a fair trial and fundamental fairness requires that the jury be properly instructed. (107 Ill. 2d R. 451(c).) The harmless error doctrine is basically the same, but it is applied where the error has been properly preserved").

PRIOR INJURIES AND IPI CRIMINAL 2d No. 26.01Q (SUPP. 1989)

The defendant concedes that he has also failed to preserve for appellate review his second and third contentions regarding the trial court's alleged errors in admitting evidence of prior abuse and in giving the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989). The record reflects that, with respect to the evidence of prior abuse, he made no contemporaneous objections to its admission once his motion *in limine* for its exclusion was denied and that he made no objection whatsoever to the giving of the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989). Moreover, neither of these alleged errors was included in his post-trial motions.

The defendant again urges that we review the issues contained in those contentions under the plain error doctrine. (See 134 Ill. 2d R. 615(a).) Having determined that the evidence in this case was not so closely balanced as to warrant the invocation of the plain error doctrine with respect to the defendant's first contention regarding the erroneous admission of hearsay, the same conclusion must be applied to his contentions regarding the alleged errors relating to evidence of prior abuse and IPI Criminal 2d No. 26.01Q (Supp. 1989).

However, with respect to the former contention, we note, as previously discussed, we would find no error in admitting evidence of prior acts of abuse which can be properly attributed to the defendant

insofar as such past acts of abuse would be relevant to prove his mental state at the time of the killing. See *People v. West*, 137 Ill. 2d 588, 560 N.E.2d 594; *People v. McCarthy*, 132 Ill. 2d 331, 547 N.E.2d 459; *People v. Lucas*, 137 Ill. 2d 399, 548 N.E.2d 1003.

With respect to the latter contention, we agree with the conclusions set forth in *People v. Basden* (1994), 264 Ill. App. 3d 530, 636 N.E.2d 919, and *People v. Summers* (1990), 202 Ill. App. 3d 1, 559 N.E.2d 1133, that giving the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) constituted error. That last paragraph provides:

> "If you find the State has proved the defendant guilty of both first degree murder and involuntary manslaughter, you should select the verdict form finding the defendant guilty of first degree murder and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of involuntary manslaughter." Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (2d ed. Supp. 1989).

As noted in *Basden* and *Summers*, the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) should not be given where the lesser included offense of an offense requiring intent or knowledge has the mental state of recklessness because of the mutual exclusivity of those mental states. (See *People v. Basden*, 264 Ill. App. 3d at 543-45, 636 N.E.2d at 929; *People v. Summers*, 202 Ill. App. 3d at 12-14, 559 N.E.2d at 1140-41.) The Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases has attempted to remedy this problem by including the following in the committee note to IPI Criminal 2d No. 26.01Q (Supp. 1989) in the third edition of the pattern criminal instructions:

> "Paragraph [1] should *not* be given when the lesser offense has the less culpable mental state of recklessness. *** A[n] example is when first degree murder (greater offense) is charged under Chapter 38, Sections 9—1(a)(1) or (a)(2), requiring proof of intentional or knowing conduct by the defendant, and involuntary manslaughter (lesser offense) is charged under Chapter 38, Section 9—3, requiring proof only that the defendant acted recklessly. By definition, the jury should not be able to find that the State has proved the defendant guilty of *both* the greater and lesser offenses in these examples, and it should not be given an instruction that implies it could do so. [Citations.] *** [W]hen the jury has found the defendant to have acted with the less culpable mental state of recklessness, it would be error for the court to tell the jury to nonetheless return a guilty verdict on the greater offense if the jury had somehow also been able to conclude that the defendant was also guilty of the greater offense because he had acted intentionally or knowingly."

(Emphasis in original.) Illinois Pattern Jury Instructions, Criminal, No. 26.01Q, Committee Note, at 386-87 (3d ed. 1992).

■ However, as discussed above with respect to the hearsay error, the evidence in this case overwhelmingly proved the defendant's guilt of first degree murder. Beyond this, we cannot say that this error was of such a magnitude to deprive him of a fair trial so that "remedying [it would be] necessary to preserve the integrity of the judicial process." *People v. Gonzalez*, 238 Ill. App. 3d at 314, 606 N.E.2d at 312; see also *People v. Tucker* (1993), 245 Ill. App. 3d 722, 730-31, 614 N.E.2d 1265, 1270-71 (finding that error in giving the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) did not rise to the level of plain error).

SENTENCING

The defendant finally maintains that the circuit court abused its discretion in sentencing him to an extended term of 80 years' imprisonment under section 5—5—3.2(b)(2) of the Unified Code of Corrections because the evidence adduced at trial does not support its finding that this murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Section 5—5—3.2(b)(2) of the Unified Code of Corrections provides in full that an extended term of imprisonment may be imposed:

"When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2).)

An extended-term sentence for first degree murder raises the possible length of imprisonment from between 20 and 60 years to between 60 and 100 years. See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(1)(a), 1005—8—2(a)(1).

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, the supreme court construed section 5—8—1(a)(1)(b) of the Unified Code of Corrections, which authorizes a sentence of natural life imprisonment for a first degree murder "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b).) The court there defined "heinous" as " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal' "; and "brutal" as " 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " (*People v. La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.) *La Pointe* is instructive here because section 5—5—3.2(b)(2), the provision upon which the circuit court predicated its imposition of an extended term, and section 5—8—1(a)(1)(b) are identical. See *People v. Andrews* (1989), 132 Ill. 2d 451, 465, 548 N.E.2d 1025, 1031.

*People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003, presents facts similar to those in the instant case. There, the victim, a seven-month-old infant, died of suffocation after the defendant deliberately shook him and struck him against the side of his crib. There also was evidence that the defendant abused the victim on earlier occasions. (132 Ill. 2d at 410-13, 428, 548 N.E.2d at 1006-07, 1014.) The supreme court in *Lucas* noted that "[c]ases in which this court has found brutal or heinous behavior to be present have generally involved prolonged pain, torture, or premeditation." (132 Ill. 2d at 445, 548 N.E.2d at 1022-23, citing *People v. Odle* (1988), 128 Ill. 2d 111, 538 N.E.2d 428; *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270.) In finding that the defendant's conduct was not so brutal or heinous as to warrant imposition of the death penalty, the court held:

> "The evidence in the present case indicates that the cause of the decedent's death was suffocation which occurred almost immediately after the injuries were inflicted. There was testimony that the injuries themselves could have been inflicted by a single blow. There is no conclusive evidence in the record to indicate that the decedent's death was either premeditated, prolonged, or tortuous. Applying the above-mentioned principles, we cannot say that the circumstances surrounding the decedent's death were exceptionally brutal or heinous *and* indicative of wanton cruelty." (Emphasis in original.) *Lucas*, 132 Ill. 2d at 446, 548 N.E.2d at 1023.

■ Under the facts of this case, we cannot say that the victim's death was accompanied by such *exceptionally* brutal or heinous behavior to satisfy the criteria imposed by our supreme court for the imposition of an extended term under section 5—5—3.2(b)(2). Although there was evidence of at least some prior abuse by the defendant (most notably the broken arm), the facts show that she died a very short time after the defendant struck two blows. There was no evidence of torture or premeditation and the crime in fact appears to be one of anger.

The State points to *People v. Smith* (1993), 241 Ill. App. 3d 446, 608 N.E.2d 1259, in support of its argument that the facts of this case support the imposition of an extended term. In *Smith* an extended sentence of 60 years' imprisonment was upheld where the three-month-old victim's mother force-fed him acid which caused severe injuries to his face, mouth, esophagus, trachea, and lungs, ultimately resulting in death after a 27-month hospitalization. (241 Ill. App. 3d at 447, 608 N.E.2d at 1260.) The defendant committed this act as part of a scheme to collect a products liability judgment from an infant formula manufacturer. 241 Ill. App. 3d at 448-54, 608 N.E.2d at 1261-64.

In this case, unlike *Smith*, there was no evidence that the victim's death was brought about by a slow, extended, and extremely painful process as well as no evidence that the murder was committed for pecuniary gain in total disregard of the victim's agony. Here, the blows which caused the victim's death were swift and her death relatively quick. We note that in considering the propriety of an extended-term sentence we may not look to prior acts of abuse which the defendant committed against the victim which neither caused nor were inflicted contemporaneously with her death. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2) (requiring that an offense be "accompanied by" exceptionally brutal or heinous conduct before an extended term of imprisonment may be imposed).) Accordingly, we cannot accept the State's argument that "[t]he instant case is analogous to *Smith*."

The State contends that in *People v. Fair* (1994), 159 Ill. 2d 51, 636 N.E.2d 455, our supreme court retreated from its position in *Lucas* which would require prolonged pain, torture or premeditation to justify an extended sentence on grounds of exceptional brutality. However, in that case, the defendant bludgeoned a sleeping 11-year-old boy to death with a baseball bat after an argument with his mother. The court stated:

> "We find that defendant's bludgeoning of an 11-year-old boy with a baseball bat as he slept in his bed at night constitutes exceptionally brutal and heinous behavior indicative of wanton cruelty. *Defendant's attack upon Gregory was without provocation, for he was not involved in any manner whatsoever with defendant's argument with Candace* [the mother]." (Emphasis added.) (159 Ill. 2d at 82, 636 N.E.2d at 472.)

Here, unlike the facts in *Fair*, the defendant was involved with this child and was provoked to anger, albeit irrationally and indefensibly, when he soiled his hands in the child's excrement as a result of the child's lapse in her toilet training. While defendant's reaction here was without any justification, it was not as monstrously wanton and cold-blooded as in *Fair*, where the defendant wantonly bludgeoned a sleeping child to death without any provocation simply because of an argument with his mother. Consequently, the standard set by our supreme court in *Lucas* and *La Pointe* must still control.

While the killing of a defenseless child under any circumstances is an abhorrent act, the tender age of the victim has not in and of itself been deemed sufficient by our supreme court to satisfy the special standards of exceptional brutality required under section 5—5—3.2(b)(2) for imposition of an extended term beyond 60 years. See *People v. Lucas*, 132 Ill. 2d 399, 548 N.E.2d 1003.

But the fact that the victim is a child of tender years permits a trial court in its discretion to impose an extended term by reason of age alone under a separate special statutory provision, section 5—5—3.2(b)(4)(i) of the Unified Code of Corrections. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(4)(i).) However, the trial court in this case had not considered that provision, having chosen instead to predicate the extended sentence upon the "exceptional brutality" provision of section 5—5—3.2(b)(2). We would therefore remand this matter to the trial judge so that he may consider on remandment whether to impose an extended sentence under the more appropriate provisions of section 5—5—3.2(b)(4)(i) by reason of the fact that the victim here was a child.

The State would urge us to uphold the defendant's extended-term sentence under the latter, more appropriate provision (section 5—5—3.2(b)(4)(i)) without the necessity of a remand even though the circuit court did not consider that provision when it imposed its sentence. However, since the circuit court did not purport to predicate its sentence on that provision, we find that the more appropriate course is to give the trial judge the first opportunity to determine the proper sentence under a sentencing provision which he did not previously purport to consider. See *People v. Abraham* (1993), 257 Ill. App. 3d 587, 598, 629 N.E.2d 148, 156 (stating in response to the State's request for an extended term that "[a]lthough we are cognizant of the need for judicial economy, the imposition of such an extended-term sentence is solidly within the discretion of the trial court [citation], which is in the best position to weigh the relevant factors and considerations involved. [Citation.]").

Upon remand, the trial judge will be free in the exercise of his discretion to reimpose an extended term pursuant to section 5—5—3.2(b)(4)(i) by reason of the victim's tender age.

For the reasons discussed above, the defendant's conviction for first degree murder is affirmed and his case remanded for resentencing.

Affirmed and remanded for resentencing.

COUSINS, P.J., and McNULTY, J., concur.